**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NAMCO, LLC,[1] | ) | Case No. 13-10610 (PJW) |
| | ) | |
| Debtor. | ) | |
| | ) | **Hearing Date and Objection Deadline: To be** |
| | ) | **determined in accordance with Court's Order on** |
| | ) | **Motion to Shorten Time** |

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AN**
**ORDER APPROVING CONSULTING**
**AGREEMENT, CERTAIN STORE CLOSING SALES AND RELATED RELIEF**

Namco, LLC ("NAMCO" or, the "Debtor"), as debtor and debtor in possession, hereby

moves this Court (the "Motion") for entry of an order (a) authorizing the Debtor to close the

retail store locations in four of its markets; (b) authorizing the Debtor to conduct store closing

sales free and clear of liens pursuant to sections 363(b) and (f) of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); and (c) authorizing the Debtor to enter

into a consulting agreement providing for the liquidation of merchandise inventory and other

assets.  In support of this Motion, the Debtor respectfully represents as follows:

**BACKGROUND**

**A.    Introduction**

1.    On March 24, 2013 (the "Petition Date"), the Debtor commenced a voluntary

petition for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy

Court for the District of Delaware (the "Court").  The Debtor continues to operate its business

and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.  On April

---

[1]    The Debtor in this case, along with the last four digits of its federal tax identification number, is Namco, LLC
(5145).

4, 2013, the Office of the United States Trustee formed an official committee of unsecured creditors (the "Creditors' Committee").

2.    NAMCO is headquartered in Manchester, Connecticut. NAMCO was founded in 1962 as a retailer of pools, pool accessories and other recreational equipment in the Northeast and Mid-Atlantic United States.   NAMCO also owns and operates a chemical repackaging facility in Manchester, and sells chemicals in NAMCO's retail stores, sells product on a wholesale basis to distributors (under a different label), and through its website; www.namcopool.com.   Due to its size and buying power, NAMCO is often able to offer the lowest prices in the markets it serves without compromising its margins.   Additionally, many of NAMCO's competitors are single location, low-volume retailers that are not able to offer product selection and customer service on par with NAMCO.   NAMCO currently operates thirty-seven (37) full-line retail stores in ten states throughout the Northeast and Mid-Atlantic, with store sizes ranging from 11,000 to 60,000 square feet, and employs 288 people as of the Petition Date. Additionally, NAMCO has approximately 190,000 square feet of office/distribution center space, and 40,000 square feet of space with respect to a chemical re-packaging facility, located next to each other, in Manchester CT.

3.    In December 2003, NAMCO was acquired by Whitney Equity Holdings Corp one of the country's oldest private equity groups, from the Radocchia family.   In connection with the purchase, NAMCO was organized in 2003 as a Delaware limited liability company.   In the years following the transaction with Whitney, NAMCO has faced several transactional, operational and technological challenges.

4.    From January of 2008 through 2012, NAMCO cut $30.7M in expenses; and its gross margin percentage grew from 41.0% to 51.3%.   However, due to the combination of a very

difficult economy; erratic summer weather patterns; and a consistent lack of working capital, NAMCO's top line sales dropped by 9.4% on a comparative store basis from 2008 to 2011.

5.      Operationally, the Debtor has built a strong company with a valuable and commendable reputation throughout the industry, primarily achieved by hiring a good, hardworking team and timely fulfillment of orders.  With spring, comes the beginning of NAMCO's busy season, with approximately 64% of its sales revenues occurring in the April thru July time period.  In fact, notwithstanding NAMCO's current liquidity issues, NAMCO anticipates a strong sales performance over the upcoming months.

6.      For the fiscal year ended December 30, 2012, the Debtor's consolidated financial statements showed net sales of approximately $82.8 million, compared with $92.2 million for the fiscal year ended January 1, 2012.  The decrease in net sales is attributable to a decline in overall demand within the pool and patio industry sector due to a poor housing market, an overall weak U.S. economy, and complicated by unfavorable weather conditions (cool and wet) in the Debtor's operating markets.

7.      In fiscal 2013, January net sales were below last year by $0.6 million or 48%, February sales were below last year by $1.5 million or 42%, and month-to-date sales through March 20th were below last year by $1.2 million or 32%.  Net sales were unfavorably impacted by weak U.S. economic conditions within the Debtor's demographic, tight liquidity conditions negatively affecting the Debtor's ability advertise and bring in merchandise, along with unfavorable weather conditions within the Debtor's operating markets.  Additionally, in efforts to minimize operating costs in January 2013, the Debtor temporarily closed a number of stores and operated 21 fewer stores than it did in January 2012, thus affecting sales negatively.

8.      Further factual background relating to the Debtor's commencement of this chapter 11 case is set forth in additional detail in the Declaration of Lee Diercks in Support of First Day Motion (the "Diercks Declaration") filed on the Petition Date and incorporated herein by reference.

**B.      The Closing Market Stores and the Consulting Agreement**

9.      When it became clear that filing for chapter 11 protection was likely, NAMCO began in earnest contemplating a scenario to exit its underperforming markets--specifically each of its stores, 14 in all, located in Delaware, Maryland, New Jersey and Pennsylvania, (each a "Closing Market Store," and collectively, the "Closing Market Stores").[2]   Exiting these underperforming markets would allow the Debtor to focus its reorganization efforts around its core stores in Northeastern states.   NAMCO determined, in its business judgment, that such Closing Market Stores should be closed promptly in order to ease the Debtor's liquidity constraints by means of store closing sales (the "Store Closing Sales").   A list of the Closing Market Stores is attached hereto as Exhibit A.

10.      The Debtor's high retail season, which peaks Memorial Day through Independence Day is soon approaching and the Debtor's ability to maximize revenue in existing territories will be best realized if the store closing process in the underperforming markets begins immediately.   The Debtor believes, particularly in light of its high season, that the ability to begin the Debtor's store closing process in these four markets as soon as possible is vital to the Debtor's reorganization efforts, its ability maximize value and to allow it to focus on operations in its core market in the Northeast.

---

[2] Notably, the five Closing Market Stores located in New Jersey operate under the trade name "Branch Brook." Because these are the only stores of the Debtor that operate under this name, the Store Closing Sales in the New Jersey Closing Market Stores will be conducted as going out of business sales.

11.     In early March, with the assistance of Lee Diercks of Clear Thinking Group ("Clear Thinking") and counsel, NAMCO began reaching out to potential nationally recognized liquidators for quotes to conduct liquidation sales in the Closing Market Stores.  In furtherance of this plan, the Debtor, led by Mr. Diercks and with the assistance of counsel, has been earnestly interviewing and hearing proposals from separate reputable and quality liquidator firms.  The Debtor has conducted many meetings, and had no less than three rounds of bidding and proposals from five national liquidators.  With such proposals in hand and in furtherance of an extensive bidding process, the Debtor held additional calls with the two highest bidders, seeking the highest and best proposal possible.

12.     Following this marketing process, the Debtor selected Gordon Brothers to act as consultant (the "Consultant").  The process took place over the course of a few weeks given the Debtor's liquidity constraints and the necessity to conduct store closing sales in the underperforming markets as promptly as possible in order to maximize revenue during the Debtor's high retail season.  Nevertheless, the process was full and complete.  Each proposal was thoroughly analyzed and vetted by the Debtor's management with the assistance of Mr. Diercks and counsel.  After consulting with its post-petition lender (and the Debtor's Board of Managers and professionals), the Debtor then determined, in the reasonable exercise of its business judgment, that the retention of Gordon Brothers as Consultant was in the best interest of the estate and its creditors and hereby seeks authority to so retain Gordon Brothers as its Consultant and to approve the Consulting Agreement with Gordon Brothers.[3]

13.     The proposed Store Closing Sales will dramatically reduce the administrative costs associated with these underperforming Closing Market Stores, are customary in chapter 11

---

[3] The Creditor's Committee was formed one day prior to the filing of the Motion.  Given the urgency of the relief sought in the Motion, the Debtor has not had the opportunity to consult with the Creditors' Committee in advance of its filing; however, the Debtor has every intention to do so prior to the hearing.

reorganizations for retail businesses, and are designed to provide the maximum value to the Debtor's estate.

14.    In order to maximize the value of the inventory to be included in the Store Closing Sales (the "Merchandise") and the owned furniture, fixtures and equipment in the Closing Market Stores (the "Owned FF&E," and together with the Merchandise, the "Assets"), the Debtor intends to engage the Consultant to conduct the sale.  Through the use of the Consultant the Debtor will ensure the most feasible, economical, and efficient means of achieving the disposition of the Assets.

15.    Accordingly, the Debtor requests the entry of an order (the "Approval Order"), pursuant to Sections 105(a), 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rules 6004 and 9014, approving (i) the Consulting Agreement with the Consultant (the "Consulting Agreement"), (ii) the Store Closing Sales and waiving the Debtor's compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales, and (iii) the procedures to be used governing the conduct of the Store Closing Sales (the "Sale Guidelines"). A copy of the proposed Approval Order is attached hereto as Exhibit B.

## JURISDICTION

16.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

17.    The statutory bases for the relief requested herein are Sections 105(a) and 363 of the Bankruptcy Code, Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## **RELIEF REQUESTED**

18.     The Debtor proposes to commence the Store Closing Sales immediately following the entry of the Approval Order and thereby stem the losses resulting from the continued operation of the Closing Market Stores and beginning maximizing revenue at the Closing Market Stores immediately.   The Debtor also seeks authority to enter into the Consulting Agreement with the Consultant who will serve as the Debtor's Consultant in conducting the Store Closing Sales in accordance with the Sales Guidelines, which procedures and guidelines are typical of and consistent with those that have been approved in this Court and bankruptcy courts nationwide in similar transactions.

19.     It is critical to commence the Store Closing Sales as soon as possible for several important reasons.  First, the Closing Market Stores are operating at a loss and represent a drain on the Debtor's liquidity.  Thus, the sooner the Assets are sold (and the Closing Market Stores' leases are rejected), the sooner the strain on the Debtor's liquidity will be mitigated.  Second, with the high season approaching upon the Debtor, any delays in the liquidation process could cause the Merchandise to become out of "season," thus, diminishing in value.   Finally, commencing the Store Closing Sales expeditiously (and before the end of the Debtor's high season) maximizes the value of such Assets and the Debtor's ability to reorganize around its Northeastern stores.

## **The Consulting Agreement**

20.     After further negotiation with the bidders and consultation with the Debtor's professionals and Board of Managers, the Debtor agreed (subject to this Court's approval) to enter into the Consulting Agreement with Gordon Brothers in the form attached as Exhibit C hereto.

21.     Although the Debtor respectfully refers the Court to the Consulting Agreement in its entirety, certain of the material terms are set forth below (with all capitalized terms having the meaning ascribed thereto in the Consulting Agreement):

- Length of Term:  Twelve Weeks

- Expenses.  Expenses of the Store Closing Sales are borne by the Debtor, pursuant to an agreed upon budget.

- Consultant's Fee.  In consideration of the services to be provided by the Consultant pursuant to the Consulting Agreement, the Consultant would be entitled to 1% of aggregate proceeds of sale of the Merchandise after gross proceeds equal or exceed 125% of the aggregate costs of Merchandise.

- Owned FF&E.  The Consultant shall sell the FF&E in the Stores for a commission equal to 15% of the proceeds generated from the sale of such assets.

- Employees.  Debtor to continue to supply employees and qualified supervisors to assist Consultant consistent with historic practices and policies.

- Sale Guidelines.  The Store Closing Sales shall be conducted in accordance with the Sale Guidelines attached to the Consulting Agreement.  The Consultant shall be authorized to advertise and promote the sales as a store closing or similar themed sale.

- Merchandise Returns/Gift Cards/Other Programs.  To be accepted in the ordinary course.

- Additional Goods.  Debtor to receive 85% of net proceeds of additional goods.  Such goods shall be construed as a true consignment and the Consultant shall have a perfected first priority security interest in the Additional Goods and the Additional Goods Proceeds (subject to limitation as set forth in the Consulting Agreement), which interest shall be deemed perfected pursuant to the Approval Order.

- Going Out of Business.  The five Closing Market Stores in New Jersey, that operate under the trade name "Branch Brook," will be conducted as going out of business sales.  No other Store Closing Sales will be conducted as going out of business sales.

22.     The Debtor believes that the terms of the Consulting Agreement are typical, customary and reasonable under the circumstances in the exercise of its prudent business judgment.  Moreover, the Debtor submits that the Consultant is not being retained under section 327 of the Bankruptcy Code and as such, may be paid as an ordinary course professional pursuant to the terms of the Consulting Agreement without necessity to file any fee application with this Court.

23.     Moreover, the Debtor's debtor in possession financing lender has indicated its support for the relief requested in the Motion, as have various landlords of the Closing Market Stores.  As set forth above, given the urgency of the relief sought in the Motion, the Debtor has not had the opportunity to consult with the Creditors' Committee in advance of its filing; however, the Debtor has every intention to do so prior to the hearing.

## THE STORE CLOSING SALES NOTICE

24.     Under Bankruptcy Rule 2002(a) and (c), the Debtor is required to notify its creditors of the Store Closing Sales, including (i) the terms and conditions of the Store Closing Sales; (ii) the date, time, and place of the hearing on this Motion; and (iii) the deadline for filing any objections to the relief requested herein (the "Store Closing Sales Notice").  The Debtor respectfully submits that the form of Store Closing Sales Notice, attached hereto as Exhibit D is typical for store closing sales previously approved in this District.  Copies of the Store Closing Sales Notice will be served on: (i) the US Trustee; (ii) counsel to the Debtor's secured lenders; (iii) the Debtor's top twenty unsecured creditors; (iv) the Debtor's landlords for the Closing Market Stores; (v) all state attorneys general in states in which the Closing Market Stores are located; (vi) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency; (vii) all entities requesting notice pursuant to Bankruptcy Rule 2002; and (viii) counsel to the Creditors' Committee.  The Debtor

requests that such notice be deemed adequate and sufficient notice as required by the Bankruptcy

Rules.

## APPROVAL OF STORE CLOSING SALES UNDER
## SECTION 363 AND FOR THE SALE OF MERCHANDISE
## FREE AND CLEAR OF ALL ENCUMBRANCES IS WARRANTED

25.    Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other
> than in the ordinary course of business, property of the estate ....

11 U.S.C. § 363(b)(1); *see also In re Ames Dep't Stores, Inc*., 136 B.R. 357, 359 (Bankr.

S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by section 363(b)).

26.    To obtain Court approval to use property under section 363(b) of the Bankruptcy

Code for the purpose of a store closing sale, the Debtor must articulate a business reason for the

proposed action.  *See, e.g., Myers v. Martin (In re Martin)*, 91 Fad 389, 395 (3d Cir. 1996)

(citing *Fulton State Bank v. Schipper (In re Schipper)*, 933 F.2d 513, 515 (7th Cir. 1991));

*Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070-71 (2d

Cir. 1983); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting

the "sound business judgment" test of *Lionel Corp.* and requiring good faith); *In re Delaware &*

*Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted

the "sound business judgment" test in the *Abbotts Dairies* decision); *Dai-Icho Kangyo Bank v.*

*Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153

(Bankr. D. Del. 1999) (same).  When a valid business justification exists, the law vests the

debtor's decision to use its property with a strong presumption "that in making a business

decision[,] the directors of a corporation acted on an informed basis, in good faith and in the

honest belief that the action taken was in the best interests of the company." *Official Comm. of*

*Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650,

656 (S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "<u>vitality by analogy</u>" in chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  In this District, once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor-in-possession has provided the potential bidders with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  *In re Delaware and Hudson Ry. Co.*, 124 B.R. at 176; *accord In re Decora Indus., Inc.*, 2002 WL 32332749 at *3 (D. Del. 2002); *see also In re Integrated Res., Inc.*, 147 B.R. at 656 (parties challenging a debtor's sound business decision must show bad faith, self-interest or gross negligence).

27.    Ample business justification exists in this case to approve the proposed Store Closing Sales.  The Debtor, with the assistance of its advisors, has determined to close the Closing Market Stores by means of the Store Closing Sales as set forth in the Consulting Agreement, and begin the monetization of the Assets.  Time is of the essence to preserve and maximize the value of the Debtor's assets before the Merchandise declines in value, and to reduce on-going administrative expenses.  Each of the Closing Market Stores contains significant levels of Merchandise that will be included in the Store Closing Sales.  The realization of fair value for these assets as promptly as possible will inure to the benefit of all stakeholders, especially if the process can begin in time for the Debtor's high season.  Therefore, the Debtor proposes to commence the Store Closing Sales at the Closing Market Stores immediately upon the entry of an order approving the Consulting Agreement.

28.    Store closing or liquidation sales are a routine occurrence in chapter 11 cases involving retail debtors.  *See In re Ames Dept. Stores, Inc.*, 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to

maximize estate assets"). Bankruptcy courts in this District have approved similar store closing sales. *See, e.g, In re Linens Holdings Co.*, Ch. 11 Case No. 08-10832 (CSS) (Jointly Administered) (Bankr. D. Del. May 13, 2008 (order authorizing Debtor to conduct store closing sales through an agent); *In re TSIC, Inc.*, Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. March 12, 2008 (order authorizing Debtor to conduct store closing sales through an agent); *In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (BLS) (Jointly Administered) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); *In re M T S Inc.*, Ch. 11 Case No. 04-10394 (PJW) (Bankr. D. Del. Mar. 2, 2004) (same); *In re Wherehouse Entm't, Inc.*, Ch. 11 Case No. 03-10224 (PJW) (Bankr. D. Del. Feb. 21, 2003) (same); *In re Zany Brainy, Inc.*, Ch. 11 Case No. 01-1749 (MFW) (SLR) (Bankr. D. Del. Oct. 11, 2001) (same).

**The Court Should Waive Compliance with Any State and Local Laws, Statutes, Rules and Ordinances Restricting Store Closing Sales**

29.     Many state and local laws, statutes, rules and ordinances require special licenses, waiting periods, time limits and other cumbersome procedures for store closing, liquidation or similar sales. By virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over the Debtor's property wherever located. 28 U.S.C. § 1334. In the context of bankruptcy cases, therefore, since parties in interest receive notice of the proposed sale, as well as opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

30.     The Bankruptcy Code preempts state and local laws that conflict with its underlying policies. *See Belculfine v. Aloe In re Shenango Group Inc.*, 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code.'... '[A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code.'"), *aff'd*, 112 F.3d 633 (3d Cir. 1997).  While preemption of state law is not always appropriate, *see Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake, Inc.)*, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt state law prohibiting taxicab leasing that was promulgated in part as public safety measure), preemption is appropriate where, as here, the only state laws involved concern economic regulation rather then the protection of public health and safety.[4]  *See id*. at 1353 (finding that "federal bankruptcy preemption is more likely. . . where a state statute is concerned with economic regulation rather than with protecting the public health and safety"); *see also In re Scott Housing Sys. Inc.*, 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic stay under Section 362 is broad and preempts state law except for those laws designed to protect public health and safety).

31.    Here, state and local licensing requirements, time limits or other restrictions on liquidation sales would undermine the fundamental purpose of Section 363(b) of the Bankruptcy Code by placing constraints on the Debtor's ability to marshal and maximize estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closing Sales without the delays and burdens associated with obtaining various state and local licenses, observing state and local waiting periods or time limits, and/or satisfying any additional requirements with respect to advertising and the like is necessary and appropriate.

32.    It is also necessary that any action by any lessor or any federal, state or local Consulting Agreement, department or governmental authority or any other entity to prevent, interfere with or otherwise hinder consummation of the Store Closing Sales or advertisement of

---

[4] The Debtor will comply with applicable state and local public health and safety laws ("Safety Laws"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "Consumer Laws").

such sales be enjoined. *See Missouri v. U.S. Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir. 1981) (same), *cert. denied*, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

33.    The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales.  The Debtor does not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  As noted above, the Debtor fully intends to be bound by and comply with all Consumer and Safety Laws, and will require that its Consulting Agreement do the same.

34.    Similar relief has been granted in other bankruptcy cases in this District. *See e.g., In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (BLS) (Jointly Administered) (Bankr. D. Del. Sept, 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); *In re M T S Inc.*, Ch. 11 Case No. 04-10394 (PJW) (Bankr. D. Del. Mar. 2, 2004) (same); *In re Zany Brainy, Inc.*, Ch. 11 Case No. 01-1749 (MFW) (Bankr. D. Del. Oct. 11, 2001) (SLR) (same).

**The Court Should Waive Any Restriction on Store Closing Sales in the Leases as Unenforceable**

35.    Certain of the leases governing the premises of the Closing Market Stores (the "Leases") may contain provisions purporting to restrict or prohibit the Debtor from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to effectively reorganize and maximize the value of its assets under Section 363 of the Bankruptcy

Code.  See *e.g., In re Ames Dep't Stores, Inc.*, 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); *In re R. H. Macy and Co., Inc.*, 170 B.R. 69, 73-74 (Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); *In re Tobago Bay Trading Co.*, 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); *In re Lisbon Shops, Inc.*, 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

36.     As such, to the extent that such provisions or restrictions exist in any of the Leases of the Closing Market Stores, such landlords may not interfere with or otherwise seek to restrict the Debtor and/or the Consulting Agreement from conducting the Store Closing Sales. Accordingly, the Debtor requests that the Court authorize the Debtor and/or the Consulting Agreement to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

37.     Bankruptcy courts in this District have held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable. *See, e.g., In re Tweeter Home Entm't Group, Inc.*, Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); *In re Three A's Holdings, L.L.C.*, Ch. 11 Case No. 06-10886 (RLS) (Jointly Administered) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to

conduct store closing sales); *In re MTS Inc.*, Ch. 11 Case No. 04-10394 (BLS) (Bankr. D. Del.

Mar. 2, 2004) (same); *In re Wherehouse Entm't, Inc.*, Ch. 11 Case No. 03-10024 (PJW) (Bankr.

D. Del. Feb. 21, 2003) (same); *In re Zany Brainy, Inc.*, Ch. 11 Case No. 01-1749 (MFW)

(opinion by Robinson, D.J.) (Bankr. D. Del. Oct. 11, 2001) (same); *In re Just For Feet, Inc.*,

Case No. 99-4110 (RRM) (Bankr. D. Del. Nov. 26, 1999) (same); *In re London Fog, Inc.*, Case

No. 99-3446 (PJW) (Bankr. D. Del. Oct. 7, 1999) (same).

## A Sale of Assets Free and Clear Of All Encumbrances is Warranted

38.    The Debtor requests approval to sell the Assets subject to the Consulting

Agreement, on a final "<u>as is</u>" basis, free and clear of any and all liens, claims and encumbrances

in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell

property under sections 363(b) and 363(f) "<u>free and clear of any interest in such property of an</u>

<u>entity other than the estate</u>" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345

(E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may

approve a sale free and clear if any one subsection is met).  The DIP Lender, who is secured by,

among other things, the Assets, has consented to the sale of the Assets.  With respect to any other

party asserting a lien, claim, or encumbrance against the Merchandise or the Owned FF&E, the

Debtor anticipates that it will be able to satisfy one or more of the conditions set forth in Section 363(f). In connection with the sale of the Assets pursuant to the terms and conditions of the Consulting Agreement, the Debtor proposes that any liens, claims, and encumbrances asserted against the Merchandise be transferred to and attach to the amounts payable to the Debtor under the Consulting Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, provided that the Debtor's share of the proceeds of the Store Closing Sales, shall be applied in accordance with any interim or final orders approving the Debtor's post-petition financing agreements.

**AFFIDAVIT OF DISINTERESTEDNESS**

39.     As set forth in the affidavit of Michael Chartock (the "Chartock Affidavit"), attached hereto as Exhibit E, the Debtor believes that: (a) except as set forth in the Chartock Affidavit, Gordon Brothers has no connection with the Debtor, its creditors, the U.S. Trustee, any person employed in the Office of the U.S. Trustee or any other party with an actual or potential interest in this chapter 11 case or their respective attorneys or accountants; (b) Gordon Brothers is not a creditor, equity security holder or insider of the Debtor; (c) Gordon Brothers is not and was not, within two years of the Petition Date, a director, officer or employee of the Debtor; and (d) Gordon Brothers does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with or interest in, the Debtor or for any other reason.

40.     Accordingly, based on the Chartock Affidavit and except as provided therein, the Debtor believes that Gordon Brothers (a) does not hold or represent any interest adverse to the Debtor or its estate, and (b) is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code. Moreover, the Debtor believes that employment of Gordon Brothers is necessary and in the best interests of the Debtor and its estate.

## REQUEST FOR WAIVER OF STAY

41.     In addition, the Debtor seeks a waiver of the 14-day stay required under Bankruptcy Rule 6004(h).   As set forth above, the Debtor is facing significant liquidity constraints.  Given both this liquidity crisis, the potential decline in value of the Merchandise and the entry of the high season, the Debtor and the Gordon Brothers want to close on this transaction as soon as possible.   Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and to the extent that they apply.

## NOTICE

42.     Notice of this Motion has been provided to: (i) the US Trustee; (ii) counsel to the Debtor's secured lenders; (iii) the Debtor's top twenty unsecured creditors; (iv) the Debtor's landlords for the Closing Market Stores; (v) all state attorneys general in states in which the Closing Market Stores are located; (vi) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Consulting Agreement; (vii) all entities requesting notice pursuant to Bankruptcy Rule 2002; and (viii) counsel to the Creditors' Committee.

## NO PRIOR REQUEST

43.     No previous application for the relief requested herein has been made by the Debtor to this or any other court.

WHEREFORE, the Debtor respectfully requests the entry of the Approval Order, substantially in the form attached hereto as Exhibit B, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated: April 5, 2013                        A. M. SACCULLO LEGAL, LLC

                                            /s/ Anthony M. Saccullo
                                            Anthony M. Saccullo (Bar No. 4141)
                                            Thomas H. Kovach (Bar No. 3964)
                                            27 Crimson King Drive
                                            Bear, Delaware 19701
                                            (302) 836-8877
                                            (302) 836-8787 (facsimile)
                                            ams@saccullolegal.com
                                            kovach@saccullolegal.com

                                                    and

                                            Michael S. Fox, Esquire
                                            Jordanna L. Nadritch, Esquire
                                            Jonathan T. Koevary, Esquire
                                            OLSHAN FROME WOLOSKY LLP
                                            Park Avenue Tower
                                            65 East 55th Street
                                            New York, New York 10022
                                            (212) 451-2300
                                            *Proposed Counsel to the Debtor*