IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NAMCO, LLC,[1] | ) | Case No. 13-10610 (PJW) |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DISCLOSURE STATEMENT WITH RESPECT TO CHAPTER 11
PLAN OF REORGANIZATION FOR NAMCO, LLC**

Dated:  May 17, 2013

**OLSHAN FROME WOLOSKY LLP**
Michael S. Fox
Jordanna L. Nadritch
Jonathan T. Koevary
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone:  (212) 451-2300
Facsimile:  (212) 451-2222

**A. M. SACCULLO LEGAL, LLC**
Anthony M. Saccullo (Bar No. 4141)
Thomas H. Kovach (Bar No. 3964)
27 Crimson King Drive
Bear, Delaware 19701
(302) 836-8877
(302) 836-8787 (facsimile)
ams@saccullolegal.com
kovach@saccullolegal.com

*Counsel to the Debtor and Debtor-in-Possession*

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.
ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE
STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE
STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED
BY THE COURT.**

---

[1]    The Debtor in this case, along with the last four digits of its federal tax identification number is Namco, LLC (5145).

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. JULY [   ], 2013 PREVAILING EASTERN TIME UNLESS EXTENDED BY THE DEBTOR.  TO BE COUNTED, COUNSEL FOR THE DEBTOR MUST <u>ACTUALLY RECEIVE</u> YOUR BALLOT ON OR BEFORE THE VOTING DEADLINE.

CERTAIN INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT, THE PLAN AND ANY EXHIBITS ATTACHED HERETO IS <u>SPECULATIVE</u>, AND PERSONS SHOULD NOT RELY ON SUCH DOCUMENTS IN MAKING INVESTMENT DECISIONS WITH RESPECT TO (A) THE DEBTOR OR (B) ANY OTHER ENTITIES THAT MAY BE AFFECTED BY THE DEBTOR'S CHAPTER 11 CASE.

2088236-1

NAMCO, LLC AS DEBTOR AND DEBTOR IN POSSESSION, IS PROVIDING THE INFORMATION IN THE DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION OF THE DEBTOR TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE PLAN.  YOU SHOULD NOT RELY UPON OR USE THE INFORMATION IN THE DISCLOSURE STATEMENT FOR ANY OTHER PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON [    ], 2013, UNLESS EXTENDED BY THE DEBTOR (THE "VOTING DEADLINE").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY COUNSEL FOR THE DEBTOR ON OR BEFORE THE VOTING DEADLINE.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(B) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND IS NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.  THE DEBTOR BELIEVES THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THE DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1934, AS AMENDED (THE "SECURITIES ACT"), AND ANY SIMILAR FEDERAL, STATE OR LOCAL LAWS IN RELIANCE ON SECTION 1145(a)(1) OF THE BANKRUPTCY CODE.  TO THE EXTENT THAT SECTION 1145(a)(1) OF THE BANKRUPTCY CODE IS INAPPLICABLE, THE DEBTOR BELIEVES THAT THE NEW SECURITIES TO BE ISSUED UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY SIMILAR FEDERAL, STATE, OR LOCAL LAWS BY REASON OF THE EXEMPTION SET FORTH IN SECTION 4(2) OF THE SECURITIES ACT OR REGULATIONS PROMULGATED THEREUNDER.

THE DEBTOR WILL BE FILING A PLAN SUPPLEMENT NO LATER THAN SEVEN (7) DAYS PRIOR TO THE CONFIRMATION HEARING

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTOR (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THE DISCLOSURE STATEMENT MAY CONTAIN "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD-LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE" OR "CONTINUE" OR THE NEGATIVE THEREOF OR

OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS.  THE DISTRIBUTION PROJECTIONS AND OTHER INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ESTIMATES ONLY, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTOR IS UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIMS ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THE DISCLOSURE STATEMENT.  THE DEBTOR URGES EACH HOLDER OF A CLAIM OR AN INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX OR BUSINESS ADVICE IN REVIEWING THE DISCLOSURE STATEMENT, THE PLAN AND EACH OF THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.  FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF DISCLOSURE CONTAINED IN THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE MERITS OF THE PLAN.

IT IS THE DEBTOR'S POSITION THAT THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION OR WAIVER.  RATHER, HOLDERS OF CLAIMS AND INTERESTS AND OTHER ENTITIES SHOULD CONSTRUE THE DISCLOSURE STATEMENT AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS RELATED TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS.

NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR CAUSE OF ACTION, CLAIM OR PROJECTED OBJECTION TO A PARTICULAR CLAIM IS, OR IS NOT, IDENTIFIED IN THE DISCLOSURE STATEMENT.  THE DEBTOR MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THE DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.  THE PLAN RESERVES FOR THE DEBTOR THE RIGHT TO BRING CAUSES OF ACTION (DEFINED IN THE PLAN) AGAINST ANY ENTITY OR PARTY IN INTEREST EXCEPT THOSE SPECIFICALLY RELEASED.

THE DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTOR'S CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE PLAN THAT ARE ATTACHED HERETO AND INCORPORATED HEREIN BY REFERENCE. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THE SUMMARIES DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTOR'S MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTOR DOES NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTOR'S MANAGEMENT HAS REVIEWED THE FINANCIAL INFORMATION PROVIDED IN THE DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR HAS USED REASONABLE BUSINESS JUDGMENT TO ENSURE THE ACCURACY OF THIS FINANCIAL INFORMATION, NO ENTITY HAS AUDITED THE FINANCIAL INFORMATION CONTAINED IN, OR INCORPORATED BY REFERENCE INTO, THE DISCLOSURE STATEMENT.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THE DISCLOSURE STATEMENT, THE DEBTOR HAS NO AFFIRMATIVE DUTY TO DO SO. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THE DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THE DEBTOR FILED THE DISCLOSURE STATEMENT. HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN MUST RELY ON THEIR OWN EVALUATION OF THE DEBTOR AND THEIR OWN ANALYSIS OF THE TERMS OF THE PLAN, INCLUDING, WITHOUT LIMITATION, ANY RISK FACTORS CITED HEREIN, IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN.

THE DEBTOR HAS NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THE DISCLOSURE STATEMENT. THE DEBTOR HAS NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTOR OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT.

PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN GREATER DETAIL HEREIN.

ALL CAPITALIZED TERMS IN THE DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, ATTACHED TO THE DISCLOSURE STATEMENT AS EXHIBIT A.

**THE DEBTOR AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

**<u>IRS CIRCULAR 230 NOTICE</u>: TO ENSURE COMPLIANCE WITH <u>IRS CIRCULAR 230</u>, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## TABLE OF CONTENTS

Page

**ARTICLE I SUMMARY** .................................................................**12**

Section 1.01.  General. ....................................................................12
Section 1.02.  Classification of Claims and Interests...........................17
Section 1.03.  Voting; Holders of Claims Entitled to Vote ..................18
Section 1.04.  Solicitation Process....................................................20
Section 1.05.  The Debtor's Plan Term Sheet....................................21
Section 1.06.  Confirmation Hearing .................................................22
Section 1.07.  Important Matters.......................................................23

**ARTICLE II BACKGROUND TO THIS CHAPTER 11 CASE** ...................**23**

Section 2.01.  The Debtor's Business ................................................23
Section 2.02.  Summary of Prepetition Indebtedness .........................25
Section 2.03.  The Debtor's Existing Equity Structure........................26
Section 2.04.  Licenses and Trademarks............................................26
Section 2.05.  Recent Financial Results.............................................26

**ARTICLE III EVENTS LEADING TO THIS CHAPTER 11 CASE** ...............**26**

Section 3.01.  Prepetition Events ......................................................26
Section 3.02.  The Events Leading to the Formulation of the Plan .................29

**ARTICLE IV ADMINISTRATION OF THE CHAPTER 11 CASE** ...............**30**

Section 4.01.  Overview of Chapter 11...............................................30
Section 4.02.  Relevant Case Background ..........................................31
Section 4.03.  No Distributions to Equity Interests. ...........................36

**ARTICLE V SUMMARY OF THE PLAN** ..........................................**36**

Section 5.01.  Summary ...................................................................36
Section 5.02.  Provisions for Treatment of Unclassified Claims.....................37
Section 5.03.  Provisions for Treatment of Classified Claims...........................39
Section 5.04.  Acceptance or Rejection of the Plan ............................41
Section 5.05.  "Confirmation Pursuant to Section 1129(b) of the
              Bankruptcy Code or "Cramdown".............................41
Section 5.06.  Elimination of Vacant Classes. ....................................42

**ARTICLE VI MEANS OF PLAN IMPLEMENTATION**........................**42**

Section 6.01.  Introduction...............................................................42
Section 6.02.  Corporate Action Non-Voting Securities.......................42
Section 6.03.  Effective Date Transactions .........................................43
Section 6.04.  Securities Registration Exemption................................43
Section 6.05.  Vesting of Assets in the Reorganized Debtor ................44
Section 6.06.  Corporate Governance ................................................44
Section 6.07.  Cancellation of Existing Securities and Agreements................44
Section 6.08.  Obligations Incurred After the Effective Date..........................44

7

Section 6.09.     General Unsecured Claims Administrator .................................................45
Section 6.10.     Post-Confirmation Operating Reports and United States
                  Trustee Fees. ........................................................................................45

**ARTICLE VII PRESERVATION AND PROSECUTION OF CAUSES OF
            ACTION HELD BY THE DEBTOR ..............................................45**

Section 7.01.     Release of Avoidance Actions .................................................................45
Section 7.02.     Preservation and Prosecution of Causes of Action. ..................................45
Section 7.03.     Objections to Claims. ..............................................................................47
Section 7.04.     No Payment or Distribution Pending Allowance .......................................47
Section 7.05.     Estimation. .............................................................................................47

**ARTICLE VIII DISTRIBUTIONS UNDER THE PLAN ...............................48**

Section 8.01.     Limitation to Full Recovery .....................................................................48
Section 8.02.     Disbursing Agent ...................................................................................48
Section 8.03.     Timing of Distributions. ..........................................................................48
Section 8.04.     Saturdays, Sundays, or Legal Holidays. ..................................................48
Section 8.05.     Distribution Record Date. .......................................................................48
Section 8.06.     Delivery of Distributions. ........................................................................49
Section 8.07.     Method of Cash Distributions. .................................................................49
Section 8.08.     Unclaimed Property. ...............................................................................49
Section 8.09.     Compliance with Tax Requirements .........................................................50
Section 8.10.     Setoffs. ..................................................................................................50
Section 8.11.     Documentation Necessary to Release Lien. ..............................................50
Section 8.12.     Distributions Under Twenty-Five Dollars .................................................51

**ARTICLE IX EXECUTORY CONTRACTS AND UNEXPIRED LEASES;
            INDEMNIFICATION OBLIGATIONS .....................................51**

Section 9.01.     General Treatment. .................................................................................51
Section 9.02.     Cure and Cure Objections. ......................................................................51
Section 9.03.     Assumption Conditioned upon Consummation of The Plan. ....................52
Section 9.04.     Bar Date for Filing Proofs of Claim Relating to Executory
                  Contracts and Unexpired Leases Rejected Pursuant to the
                  Plan .....................................................................................................53
Section 9.05.     Treatment of Rejection Claims. ...............................................................53
Section 9.06.     Reinstatement and Continuation of Insurance Policies. .............................53

**ARTICLE X EFFECT OF CONFIRMATION ............................................53**

Section 10.01.    Binding Effect. ........................................................................................53
Section 10.02.    Continued Corporate Existence. ..............................................................53
Section 10.03.    Vesting of Property. ................................................................................54
Section 10.04.    Discharge of Claims Against and Interests in the Debtor. ..........................54
Section 10.05.    Injunction Against Interference With Plan. ...............................................54
Section 10.06.    Injunction. ..............................................................................................54
Section 10.07.    Releases. ................................................................................................55
Section 10.08.    Exculpation and Limitation of Liability. ...................................................57
Section 10.09.    Injunction Related to Releases and Exculpation. .......................................58

8

Section 10.10.    Administrative Expense Claims Incurred After the
                  Confirmation Date. ...............................................................58
Section 10.11.    Term of Injunctions or Stays.................................................58

**ARTICLE XI RETENTION OF JURISDICTION** ............................................**59**

Section 11.01.    Exclusive Jurisdiction of Bankruptcy Court. ..........................59
Section 11.02.    Non-Exclusive Jurisdiction of Bankruptcy Court.....................60
Section 11.03.    Failure of Bankruptcy Court to Exercise Jurisdiction..............61

**ARTICLE XII CONFIRMATION AND EFFECTIVENESS OF THE PLAN** ....................**61**

Section 12.01.    Conditions Precedent to Confirmation, Generally.....................61
Section 12.02.    Conditions Precedent to Confirmation.....................................62
Section 12.03.    Statutory Confirmation Requirements ......................................63
Section 12.04.    Conditions Precedent to the Effective Date. .............................66
Section 12.05.    Waiver of Conditions Precedent and Bankruptcy Rule
                  3020(e) Automatic Stay. ......................................................66
Section 12.06.    Effect of Failure of Conditions. ..............................................67

**ARTICLE XIII FINANCIAL INFORMATION** ..............................................**67**

Section 13.01.    Feasibility; Financial Projections.............................................67
Section 13.02.    Valuation of the Debtor. ........................................................68

**ARTICLE XIV CERTAIN FEDERAL INCOME TAX CONSEQUENCES**
                  **OF THE PLAN**.........................................................................**72**

Section 14.02.    Consequences to the Debtor....................................................75

**ARTICLE XV SECURITIES LAW MATTERS** ...............................................**75**

Section 15.01.    General. ..............................................................................75
Section 15.02.    New Equity Units.................................................................75

**ARTICLE XVI SUMMARY OF VOTING PROCEDURES** ...................................**78**

**ARTICLE XVII CERTAIN FACTORS TO BE CONSIDERED**
                  **REGARDING THE PLAN** ...........................................................**79**

Section 17.01.    Certain Bankruptcy Considerations. ........................................79
Section 17.02.    Risks Relating to the GUC Note and Contingent Note
                  Issued to Holders of AllowedGeneral Unsecured Claims ........80
Section 17.03.    Certain Tax Consequences of the Plan Raise Unsettled and
                  Complex Legal Issues and Involve Factual Determinations....................81
Section 17.04.    Risks Associated with the Business.........................................81

**ARTICLE XVIII MISCELLANEOUS PROVISIONS**.........................................**82**

Section 18.01.    Binding Effect of Plan. .........................................................82
Section 18.02.    Severability. .......................................................................82
Section 18.03.    Governing Law. ...................................................................82
Section 18.04.    Amendments. .....................................................................83
Section 18.05.    Revocation or Withdrawal of the Plan.....................................83
Section 18.06.    Confirmation Order...............................................................83

9

Section 18.07.    Section 1125(e) of the Bankruptcy Code...................................................83
Section 18.08.    Notices. ..................................................................................................84
Section 18.09.    Filing of Additional Documents. .............................................................84
Section 18.10.    Time. ......................................................................................................84
Section 18.11.    Exhibits/Schedules....................................................................................85
Section 18.12.    Defenses with Respect to Impaired or Unimpaired Claims......................85
Section 18.13.    No Injunctive Relief..................................................................................85
Section 18.14.    No Admissions..........................................................................................85
Section 18.15.    Extension of Time.....................................................................................85
Section 18.16.    Creditors' Committee................................................................................85
Section 18.17.    Payment of Statutory Fees. ......................................................................85
Section 18.18.    Conflict. ...................................................................................................86
Section 18.19.    Reservation of Rights................................................................................86

**ARTICLE XIX ALTERNATIVES TO CONFIRMATION OF THE PLAN** ......................**86**

**ARTICLE XX CONCLUSION** ...............................................................................................**87**

## **EXHIBITS**

EXHIBIT A          Plan of Reorganization

EXHIBIT B          Financial Projections

EXHIBIT C          Discounted Cash Flow Analysis

EXHIBIT D          Liquidation Analysis

2088236-1

# ARTICLE I

# SUMMARY

**Section 1.01.        General.**

Namco, LLC, (the "Company" or the "Debtor") as debtor and debtor in possession, hereby transmits the Disclosure Statement (as may be amended, supplemented or otherwise modified from time to time, the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101- 1532, as amended (the "Bankruptcy Code"), in connection with the Debtor's solicitation of votes (the "Solicitation") to confirm the Chapter 11 Plan of Reorganization for Namco, LLC dated as of May 17, 2013, a copy of which is attached to the Disclosure Statement as Exhibit A (as may be amended, the "Plan").[2]

The purpose of the Disclosure Statement is to set forth information concerning: (i) the history of the Debtor and its business; (ii) the Chapter 11 Case; and (iii) the Plan and alternatives to the Plan.  The Disclosure Statement also notifies Holders of Claims and Interests of their rights under the Plan, and guides Holders of Claims entitled to vote on the Plan, so they may make an informed judgment regarding whether they should vote to accept or reject the Plan.

The Plan described in the Disclosure Statement provides for the Debtor's emergence from the Chapter 11 Case, which the Company anticipates will occur in July, 2013.  The Plan provides for the reorganization of the Company's capital structure with all of the Company's issued and outstanding equity interests being cancelled and new units of the Company (the "New Equity Units") being issued to the Plan Sponsors who, together with "exit" lenders will finance the Company's anticipated working capital needs.  Under the Plan, creditors entitled to a distribution will be receiving their consideration in the form of cash and/or a note.

Prior to the Petition Date, and following careful consideration of all alternatives, the Debtor determined that the commencement of the Chapter 11 Case was a prudent and necessary step to maximize the going concern value of the Debtor's business.  Through the commencement of the Chapter 11 Case, the Debtor intended to restructure its debt obligations while continuing normal operations.  Under the Plan, the Plan Sponsors will invest an aggregate capital commitment of $3,000,000 and in exchange will receive 100% of the New Equity Units issued by the Company.  Existing Equity Interests of the Debtor will be cancelled.  Second Lien Claims and General Unsecured Claims are impaired, but Holders of such claims will receive their pro rata portion of cash and notes on account of such claims, each as set forth in the Plan.  Importantly, the proposed debt and equity restructuring pursuant to the proposed Plan will enhance the Debtor's liquidity and reduce its leverage.

The Debtor commenced the Chapter 11 Case after extensive discussions among the Debtor and its prepetition senior lender, Salus CLO 2012 1, Ltd. ("Salus").  Salus provided debtor in possession financing pursuant to that certain Senior Secured, Super Priority Debtor in Possession Credit Agreement dated as of March 28, 2013 (as amended from time to time).  Pursuant to the DIP Credit Agreement, the Debtor proceeded with a dual-track process

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in Section 1.01 of the Plan.

12

culminating with a Definitive Sheet for Proposed Restructuring of Namco, LLC dated April 30, 2013 (the "Plan Term Sheet"), entered into by the Debtor, the Creditors' Committee and each of the Plan Sponsors. Pursuant to the terms of the Plan Term Sheet, the Debtor and each of the signing constituencies agreed to support the restructuring transactions contemplated by the Plan, subject to certain conditions as set forth therein.

On June [  ], 2013 the Bankruptcy Court entered an order: (i) Granting Approval of the Proposed Disclosure Statement to Accompany the Debtor's Plan Of Reorganization; (ii) Scheduling a Combined Hearing Under 11 U.S.C. § 105(d)(2)(B)(Vi) to Approve the Adequacy of the Disclosure Statement and to Confirm the Chapter 11 Plan of Reorganization; (iii) Prescribing Notice and Solicitation Procedures; and (iv) Establishing Deadlines and Procedures for Filing Objections to the Approval of the Disclosure Statement or Confirmation of Plan. **The Order establishes [  ], 2013 at 4:00 p.m. (prevailing Eastern Time) as the deadline for the return of Ballots accepting or rejecting the Plan (the "Voting Deadline"). APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim entitled to vote on the Plan should read the Disclosure Statement and the Exhibits hereto, including the Plan and the Disclosure Statement Order, as well as the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to the Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, Holders of Claims entitled to vote should not rely on any information relating to the Debtor and its business other than the information contained in the Disclosure Statement, the Plan and all Exhibits hereto and thereto.

Under the Plan, Holders of Allowed Class 4 General Unsecured Claims will receive as follows:

- its pro rata share of the proceeds of $2 million to be paid by the Reorganized Debtor on the Effective Date, payable as follows:

  o $500,000 cash distribution on the Effective Date;

  o an amount equal to one third of the remaining principal amount on each anniversary of the Effective Date thereafter

- its pro rata share of the proceeds in an amount equal to 5% of the net proceeds over $30 million from a sale of the Company, payable if and only if the Reorganized Company is sold for more than $30 million within three years of the Effective Date.

Based on the recoveries, the Creditors' Committee supports the Plan.  The Debtor submits that, because Holders of Allowed General Unsecured Claims would receive no recoveries under a liquidation, the Plan presents the best options for such Holders.

THE DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN.  THE DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW.  THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY.  HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED EXHIBITS AND ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS.  THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of the Disclosure Statement (including the Exhibits hereto) are available upon request made to the Debtor's balloting agent, Epiq Bankruptcy Solutions, LLC ("Epiq" or the "Balloting Agent") by email at tabulation@epiqsystems.com by calling 646-282-2500 or by writing:

| Via First Class Mail: | Via Hand Delivery/ Overnight Courier: |
|---|---|
| **Namco Ballot Processing**<br>**c/o Epiq Bankruptcy Solutions, LLC**<br>**FDR Station, PO Box 5014**<br>**New York, NY 10150-5014** | **Namco Ballot Processing**<br>**c/o Epiq Bankruptcy Solutions, LLC**<br>**757 Third Avenue, 3rd Floor**<br>**New York, NY 10017** |

In addition, a Ballot for voting to accept or reject the Plan is enclosed with the Disclosure Statement for the Holders of Claims that are entitled to vote to accept or reject the Plan. If you are a Holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact the counsel for the Debtor at the address and phone number listed above.

Each Holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

The Plan organizes the Debtor's creditor and equity constituencies into groups called "Classes."  For each Class, the Plan describes (a) the underlying "Claim" or "Interest," (b) the recovery available to the Holders of Claims or Interests in that Class under the Plan, (c) whether the Class is "Impaired" under the Plan, meaning that each Holder will receive less than the full value on account of its Claim or Interest or that the rights of Holders under law will be altered in some way (such as receiving stock instead of holding a Claim) and (d) the form of consideration

14

(*e.g.*, Cash, stock or a combination thereof), if any, that such Holders will receive on account of their respective Claims or Interests.

The table below provides a summary of the classification, treatment and estimated recoveries of Claims and Interests under the Plan.  This information is provided in summary form below for illustrative purposes only, is subject to material change based on contingencies related to the claims reconciliation process, and is qualified in its entirety by reference to the provisions of the Plan.

**THE ESTIMATED PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND ARE THEREFORE SUBJECT TO CHANGE.**

15

### SUMMARY OF TREATMENT OF CLAIMS AND EQUITY INTERESTS AND ESTIMATED RECOVERIES

| Class | Treatment of Claims and Interests | Estimated Aggregate Claims | Estimated Percent Recovery | |
|---|---|---|---|---|
| | | | Plan | Liquidation |
| Class 1: Priority Non-Tax Claims | Each Holder of an Allowed Priority Non-Tax Claim, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Priority Non-Tax Claim, will not be impaired and on the later of the Effective Date or the date any such unsecured, priority claims are Allowed, such unsecured, priority claims shall be assumed or paid in full in cash by the Reorganized Debtor. | -- | 100% | [   ] % |
| Class 2: Senior Lender Claims | Solely to the extent such Senior Lender Claims are not paid in full prior to the Effective Date, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Senior Lender Claims, Allowed Senior Lender Claims will be paid in cash in full on the Effective Date. | approximately $9,304,025 (principal amount), net of all amounts paid on account of the Senior Lender Claims prior to the Effective Date | 100% | 100% |
| Class 3: Second Lien Claims | The Second Lien Collateral Agent, on behalf of holders of Allowed Second Lien Claims, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Second Lien Claims, on the Effective Date will receive (i) a $6,000,000 three (3) year secured note, which shall bear interest, paid quarterly, equal to (a) 8% per annum payable in kind in year one, and (b) 12% per annum payable in cash in all years thereafter, which note shall be secured by a lien on all assets of the Reorganized Debtor, (ii) cash on the effective date equal to the reasonable costs and expenses of the Second Lien Collateral Agent in connection with the Company, and (iii) an Allowed Class 3 General Unsecured deficiency claim equal to $3.265 million. | $9,256,985.30 (principal amount) | 65% plus deficiency claim | [   ]% |

16

| Class 4: General Unsecured Claims | Each Holder of an Allowed General Unsecured Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim, (i) its pro rata share of the proceeds of the $2 million GUC Note issued by the Reorganized Debtor on the Effective Date, which shall be payable as follows (a) $500,000 cash distribution on the Effective Date; and (b) in an amount equal to one third of the remaining principal amount of the GUC Note on each anniversary of the Effective Date thereafter, and (ii) contingent note in an amount equal to 5% of the net proceeds over $30 million from a sale of the Company, such contingent note shall be payable if and only if the Reorganized Company is sold for more than $30 million within three years of the Effective Date. | $30-35 million | 5-7% | 0% |
| Class 5: Existing Equity Interests | Each Holder of the Debtor's Existing Equity Units, as well as any options, warrants or similar instruments derived from or relating to any such common or preferred interests shall not receive or retain any property or interests on account of such interest, and any such interests shall be cancelled and extinguished on the Effective Date. | -- | 0% | 0% |

The Debtor and the Creditors' Committee believes that the Plan provides the best recoveries possible for Holders of Allowed Claims and Interests and strongly recommends that, if such Holders are entitled to vote, they vote to accept the Plan.

### Section 1.02.       Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtor, and specifies which Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | No | No (Deemed to accept) |
| Class 2 | Senior Lender Claims | No | No (Deemed to accept) |
| Class 3 | Second Lien Claims | Yes | Yes |
| Class 4 | General Unsecured Claims | Yes | Yes |
| Class 5 | Existing Equity Interests | Yes | No (Deemed to reject) |

17

**Section 1.03.          Voting; Holders of Claims Entitled to Vote**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject such proposed plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan.  Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.  In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property on account of their claims or equity interests are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

In connection with the Plan:

- Claims in Classes 3 and 4 are Impaired and the Holders of such Claims will receive distributions under the Plan.  As a result, Holders of Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan;

- Claims in Classes 1 and 2 are Unimpaired.  As a result, Holders of Claims in Classes 1 and 2 are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan; and

- Interests in Class 5 are Impaired and the Holders of such Interests will not receive any distribution on account of such Interests.  As a result, the Holders of Interests in Class 5 are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  **Your vote on the Plan is important**.  The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

Because the Plan is deemed rejected by at least one Class, the Debtor intends to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept the plan.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  The Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtor are providing to creditors for their use in

determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete, execute and return your Ballot(s) to the counsel for the Debtor at the address below:

| **Via First Class Mail:** | **Via Hand Delivery/ Overnight Courier:** |
|---|---|
| **Namco Ballot Processing**<br>**c/o Epiq Bankruptcy Solutions, LLC**<br>**FDR Station, PO Box 5014**<br>**New York, NY 10150-5014** | **Namco Ballot Processing**<br>**c/o Epiq Bankruptcy Solutions, LLC**<br>**757 Third Avenue, 3rd Floor**<br>**New York, NY 10017** |

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE <u>ACTUALLY</u> RECEIVED BY COUNSEL FOR THE DEBTOR NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME**, ON [    ], 2013 UNLESS EXTENDED BY THE DEBTOR.  YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER.  ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto.  Accordingly, in voting on the Plan, please use only the Ballots sent to you with the Disclosure Statement or provided by the Debtor's counsel.

The Debtor has fixed **4:00 p.m. (prevailing Eastern Time) on [   ], 2013** (the "Voting Record Date"), as the time and date for the determination of Persons who are entitled to receive a copy of the Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan.  Accordingly, only Holders of record of Claims as of the Voting Record Date that are entitled to vote on the Plan, will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims has accepted the Plan. Counsel for the Debtor will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Class entitled to vote.

THE DEBTOR AND THE CREDITORS' COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

T

he Debtor's legal advisor is Olshan Frome Wolosky LLP.  It can be contacted at:

 Olshan Frome Wolosky LLP

 65 East 55th Street
 New York, NY 10022
 Attention: Michael S. Fox
         Jordanna L. Nadritch
         Jonathan T. Koevary

**Section 1.04.        Solicitation Process**

The following documents and materials will constitute the Debtor's Solicitation Package which may be sent, at the Debtor's option, by hard copy book or CD-ROM:

- Plan;

- Disclosure Statement;

- Order approving the Disclosure Statement and related Solicitation Procedures ("Disclosure Statement Order");

- Notice of the hearing at which confirmation of the Plan will be considered ("Confirmation Hearing Notice");

- Appropriate ballot and voting instructions; and

- Pre-addressed, postage prepaid return envelope.

The Debtor intends to distribute the Solicitation Packages no fewer than twenty-eight (28) calendar days before the Voting Deadline or on such other schedule as is approved by the Bankruptcy Court.  The Debtor submits that distribution of the Solicitation Packages at least twenty-eight (28) calendar days prior to the Voting Deadline or on such other schedule as is approved by the Bankruptcy Court will provide the requisite materials to Holders of Claims entitled to vote on the Plan in compliance with Bankruptcy Rules 3017(d) and 2002(b).

The Solicitation Package will be distributed to Holders of Claims in Classes 3 and 4 as of the Voting Record Date and in accordance with the Solicitation Procedures.  The Solicitation Package (except the Ballots) by email at tabulation@epiqsystems.com by calling 646-282-2500 or by writing:

| Via First Class Mail: | Via Hand Delivery/ Overnight Courier: |
|---|---|
| **Namco Ballot Processing** **c/o Epiq Bankruptcy Solutions, LLC** **FDR Station, PO Box 5014** **New York, NY 10150-5014** | **Namco Ballot Processing** **c/o Epiq Bankruptcy Solutions, LLC** **757 Third Avenue, 3rd Floor** **New York, NY 10017** |

Other parties entitled to receive the Solicitation Packages, including the IRS and other relevant taxing authorities, will be served paper or electronic copies of the order approving the Disclosure Statement, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan, and the Confirmation Hearing Notice.

### Section 1.05.        The Debtor's Plan Term Sheet

Consistent with the terms of the Plan, and as described herein, through this Chapter 11 Case, the Debtor seeks to efficiently reduce the substantial debt burden that hinders its ability to effectively compete in a competitive market that has been challenged by overall economic conditions.  A successful restructuring will allow the Debtor to concentrate its resources on generating revenue in its core markets.  To this end, the Debtor and its advisors negotiated with the Debtor's senior secured lender for financing, to ensure that its business continues to operate as a going concern.

The Plan Term Sheet, contemplates an expedited restructuring, to be consummated through the Plan, and provides that the Creditors' Committee and the Plan Sponsors are committed to support the Plan subject to the conditions set forth therein.  The Debtor and the Creditors' Committee firmly believe that the Plan will maximize the value of the Debtor's Estate and will provide the best recovery to the Debtor's stakeholders.

The Plan Term Sheet is the product of approximately six weeks of negotiations and actions taken since the Debtor's chapter 11 filing.  From the beginning of the Debtor's chapter 11 case, to facilitate the restructuring and provide assurances to key constituents such as employees, customers and vendors that the Debtor's operations will continue uninterrupted, the Debtor developed key strategies to effectuate a smooth transition of its operations into chapter 11, including the following:

(a)        developing and presenting a comprehensive request for the "first-day" relief requested in the First Day Motions, including relief targeted to ensure that employee obligations such as wages and benefits are honored, customer commitments are honored, and the Debtor's cash management system can continue unaffected;

(b)        negotiating debtor in possession financing with its Senior Lender and honoring its obligations, including, among other things, entry into a reasonably agreeable plan term sheet on a fast track to avoid liquidation or sale of the Debtor's business; moving forward on an expedited basis with a negotiated chapter 11 plan of reorganization;

21

(c)      hiring and seeking to retain qualified and experienced professionals including counsel and Lee Diercks as Chief Restructuring Officer to assist the Debtor with its reorganization plan and negotiations with its go-forward landlords;

(d)      working and negotiating with all of its key constituencies, including the Creditors' Committee;

(e)      retaining an outside consultant to conduct store closing liquidation sales in the Debtor's non-performing markets in four states: Delaware, Maryland, New Jersey and Pennsylvania;

(f)      retain an outside consultant to conduct lease mitigation and negotiation; and

(g)      negotiation of and entry into the Plan Term Sheet which provides (a) equity cash commitments of up to $3 million; (b) exit financing commitments; and (c) a cash and debt distribution to Holders of General Unsecured Claims.

As set forth in section 13.02 of the Disclosure Statement, based on the discounted cash flow method, the Debtor has estimated the going concern value of the enterprise at approximately $[   ] million.

At this valuation, the Debtor believes that, absent the transactions contemplated in the Plan Term Sheet, including the new equity commitments; Holders of General Unsecured Claims would not be able to recover any value in this case.

### Section 1.06.      Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan.

**The Confirmation Hearing will commence on [     ], 2013 at [   ].m., prevailing Eastern Time**, before The Honorable Peter J. Walsh, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

**The Plan Objection Deadline is 4:00 p.m. prevailing Eastern Time on [   ], 2013**.  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in accordance with the Disclosure Statement Order on or before the Plan Objection Deadline.  In accordance with the Confirmation Hearing Notice filed with the Bankruptcy Court, objections to the Plan or requests for modifications to the Plan, if any, must:

- Be in writing;

- Conform to the Bankruptcy Rules and the Local Bankruptcy Rules;

22

- State the name and address of the objecting Creditor and the amount and nature of the Claim or Interest of such Creditor;

- State with particularity the basis and nature of the objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and

- Be filed, contemporaneously with proof of service, with the Bankruptcy Court and served so that it is **actually received** by the notice parties identified in the Confirmation Hearing Notice on or prior to the Plan Objection Deadline.

> **THE BANKRUPTCY COURT MAY NOT CONSIDER OBJECTIONS TO THE PLAN UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE PROCEDURES SET FORTH IN THE DISCLOSURE STATEMENT ORDER.**

### Section 1.07.      Important Matters

The Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements.  The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of the Debtor, which in each case may vary significantly from those set forth in such projected financial information.  Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtor, the Reorganized Debtor, its advisors, or any other Person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE II

## BACKGROUND TO THIS CHAPTER 11 CASE

### Section 2.01.      The Debtor's Business

### 1.      The Debtor's Operations

On March 24, 2013, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the stated intent of restructuring the Debtor and its outstanding indebtedness.

23

The Debtor is headquartered in Manchester, Connecticut.  The Debtor was founded in 1962 as a retailer of pools, pool accessories and other recreational equipment in the Northeast and Mid-Atlantic United States.  The Debtor also owns and operates a chemical repackaging facility in Manchester, and sells chemicals in the Debtor's retail stores, sells product on a wholesale basis to distributors (under a different label), and through its website; www.namcopool.com.  Due to its size and buying power, the Debtor is often able to offer the lowest prices in the markets it serves without compromising its margins.  Additionally, many of the Debtor's competitors are single location, low-volume retailers that are not able to offer product selection and customer service on par with the Debtor.  The Debtor currently operates thirty-seven (37) full-line retail stores in ten states throughout the Northeast and Mid-Atlantic, with store sizes ranging from 11,000 to 60,000 square feet.  Additionally, the Debtor has approximately 190,000 square feet of office/distribution center space, and 40,000 square feet of space with respect to a chemical re-packaging facility, located next to each other, in Manchester Connecticut.

Through this Chapter 11 Case, the Debtor seeks to efficiently reduce the substantial debt burden that hinders its ability to effectively compete in a competitive market that has been challenged by overall economic conditions.  A successful restructuring will allow the Debtor to concentrate its resources on generating revenue and expanding market share.  To this end, the Debtor and its advisors have been negotiating with the Debtor's key creditor constituencies to ensure its business continues to operate as a going concern.

These arms-length negotiations have been successful, and have culminated in the Plan Term Sheet, as discussed above.  The Debtor and the Creditors' Committee firmly believe that the Plan will maximize the value of the Debtor's Estate and will provide the best recovery to the Debtor's stakeholders.  As set forth below, the Debtor is closing 14 locations in its underperforming markets.  Its reorganization is based upon operating the Debtor's 23 go-forward stores in the northeast.

### 2.    Employees

As of the Petition Date, the Debtor employed 288 people.  None of the employees are represented by a collective bargaining unit.

### 3.    Officers

As of the date hereof, the Debtor has two individuals comprising the Debtor's senior management.  These individuals are (i) Mark Scott, Chief Executive Officer and President, and (ii) Lee Diercks, Chief Restructuring Officer.

### 4.    Board Members

As of the Date hereof, the  Debtor has four individuals comprising the Debtor's board of managers.  These individuals are (1) Mark Scott, (ii), Norman Matthews; (iii), Steven Pickhardt and (iv) Charles Koons.

### 5.    Corporate Structure

The Debtor operates as a standalone entity, with no subsidiaries.

### Section 2.02.    Summary of Prepetition Indebtedness

The Debtor is highly leveraged, with a total of approximately $50 million in prepetition debt, as of the Petition Date, as more fully described below:

### 1.    The Debtor's Senior Secured Credit Facility.

The Debtor is party to that certain Credit Agreement dated June 1, 2012 (as amended from time to time, the "Senior Loan Agreement") by and between the Debtor as Lead Borrower and Salus CLO 2012 1, Ltd. (as assignee of Salus Capital Partners LLC) ("Salus").  The Senior Loan Agreement is secured by substantially all of the Debtor's assets.  As of the Petition Date, the Debtor had drawn a principal amount on the revolver of approximately $9.3 million.

As discussed in section 4.02 below, post-petition, the parties received authorization from the Bankruptcy Court to enter into the DIP Credit Agreement with Salus, in order to provide for debtor-in-possession financing for the Debtor.  The DIP Credit Agreement provided for a maximum revolver of $16,000,000.  A key feature of the DIP facility was that it included a "creeping roll-up," such that funds advanced under the DIP Credit Facility were used to pay down prepetition amounts due under the Senior Loan Agreement, as well as to fund certain other expenses of the Debtor pursuant to an approved budget.  The prepetition amounts outstanding under the Senior Loan Agreement were fully satisfied through the proceeds of the DIP Credit Agreement on May 10, 2013.

### 2.    The Debtor's Second Lien Debt

The Debtor is also a borrower under certain subordinated secured notes (collectively, the "Second Lien Notes") aggregating to a principal amount of approximately $9.3 million.  Of this amount, the Debtor owes approximately $6.2 million in principal to the Second Lien Collateral Agent.  M Plus Capital Partners, LP and Westwind Investors, LP are owed the balance.  As of the Petition Date, the Second Lien Collateral Agent was an approximate 50% equity holder of the Debtor.  The Second Lien Lender Claims are secured by a second lien on substantially all of the Debtor's assets.  Pursuant to their the terms of the Second Lien Credit Agreement and related documents and orders of the Bankruptcy Court, the Second Lien Notes are junior in priority to the amounts owing under the DIP Credit Agreement and to any amounts owing under the Senior Loan Agreement

### 3.    The Debtor's Unsecured Debt.

As of the Petition Date, the Debtor had approximately $32.3 million in unsecured debt.  Of this amount, most is owed to various trade creditors and landlords.  In addition, the Debtor owes approximately $1.3 million in principal amount pursuant to an unsecured promissory note in favor of one of its former chief executive officer's, John Froman.  As of the Petition Date, the Debtor's remaining unsecured claims were comprised of trade debt of approximately $29.0 million owed to hundreds of vendors, and customer liabilities of approximately $2.5 million.

25

**Section 2.03.        The Debtor's Existing Equity Structure**

The Debtor is a limited liability company and does not have any subsidiaries.  As of the Petition Date, approximately 50% of the Debtor's senior-most preferred class of equity was owned by GarMark Partners II L.P. and another 50% of such class was owned by Whitney Equity Holdings Corp.  These two entities and their affiliates own a majority of the aggregate classes of equity of the Debtor on a combined basis.

**Section 2.04.        Licenses and Trademarks**

The Debtor owns the rights to certain registered trademarks and domain names, including Namco, Branchbrook, namcopool.com, prolinechemicals.com and branchbrook.co.

**Section 2.05.        Recent Financial Results.**

For the fiscal year ended December 30, 2012, the Debtor's consolidated financial statements showed net sales of approximately $82.8 million, compared with $92.2 million for the fiscal year ended January 1, 2012.  The decrease in net sales is attributable to a decline in overall demand within the pool and patio industry sector due to a poor housing market, an overall weak U.S. economy, complicated by unfavorable weather conditions (cool and wet) in the Debtor's operating markets.

In fiscal 2013, January net sales were below last year by $0.6 million or 48%, February sales were below last year by $1.5 million or 42%, and month-to-date sales through March 20th were below last year by $1.2 million or 32%.  Net sales were unfavorably impacted by weak U.S. economic conditions within the Debtor's demographic, tight liquidity conditions negatively affecting the Debtor's ability advertise and bring in merchandise, along with unfavorable weather conditions within the Debtor's operating markets.  Additionally, in efforts to minimize operating costs in January 2013, the Debtor temporarily closed a number of stores and operated 21 fewer stores than it did in January 2012, thus affecting sales negatively.


## ARTICLE III

## EVENTS LEADING TO THIS CHAPTER 11 CASE

**Section 3.01.        Prepetition Events**

### A.  Weather and Economic Factors Leading to Alleged Covenant Defaults

The Company entered into the Senior Loan Agreement with Salus in June 2012.   The revolver (the "Revolver") under the Senior Loan Agreement includes "high" and "low" season caps of $20 million and $10 million respectively.  High season is defined as March 1st - September 30th.  The Revolver included a monthly minimum availability covenant; a cash-flow based pay-down requirement; and a quarterly, cumulative EBITDA covenant, together with a number of other financial and non-financial covenants.  The Company successfully achieved all

of the monthly minimum availability covenants.  In the fall of 2012, however, the Company had difficulties satisfying the $2 million pay-down provision and required a two week extension to successfully satisfy the provision.

A number of economic factors contributed to the difficulty in meeting this requirement, but most significantly was a winter pool cover season (which is accompanied by 70% gross margins) that fell about $2 million short of plan and significantly below historical results. Industry sources have suggested that the pool cover season was soft throughout the Company's footprint and that the softness was attributable to the historically mild 2011/2012 winter and lack of snow; which minimized pool and cover damage; which resulted in fewer replacement cover sales.

The Company then defaulted on its December 2012 EBITDA covenant.  Specifically, in addition to the poor winter pool cover season, the Company was impacted by a cool, wet spring in 2012.  The latter factor delayed pool openings--causing some customers to decide not to open their pools at all.  Furthermore, the Company's core customer, who makes $75,000 - $150,000 per year; has two to three children; and a house worth approximately $250,000, while improving economically, continues to struggle overall in this economy.  As a result, the Company missed its sales plan for 2012 by approximately $10 million and, despite significant expense and cost control measures, missed the year-end EBITDA covenant.

In addition to the December 2012 EBITDA default, the Company also defaulted on certain other covenants.  Most of these defaults related to lender reporting requirements, including with regard to status of dispute and payment issues with landlords.  Others were cross-defaults, including those that allegedly arose in connection with the Company's obligations under its Second Lien Credit Agreement.

## B.  Negotiations with Salus

In February, 2013 on account of the defaults under the Senior Loan Agreement, the Company entered into a forbearance agreement with Salus.  In connection therewith, Salus retained SD Retail Consulting and Hilco Appraisal to perform an operational review and new inventory valuation.  Upon completion of the operational review, the Company was presented with a report that took issue with the Company's 2013 business plan.  The Company disputes almost all of the conclusions contained in the report.

Since late January 2013, Salus had been working closely with management (Mark Scott; a group of outside investors; and five other senior members of the management team) - with the understanding that this group was considering the purchase of 50% of the Company (Whitney's ownership interest) and would infuse a minimum of $1.5 million of working capital into the business, junior in position to Salus.  Pursuant to the forbearance agreement, the sale/purchase of Whitney's equity, the capital infusion and the continuing of Salus's financing were all events that were to have happened simultaneously by the conclusion of the forbearance period, March 8, 2013.  Moreover, pursuant to the forbearance agreement, the Company would be unable to access the relied upon high season cap of $20 million come March 1, 2013.

By the week of March 4, 2013, it was clear that more time was needed and the Company would not be able to obtain this capital infusion by March 8.  Salus advised that it would contemplate an additional one-week forbearance, but only on strict terms.  These terms contemplated the Company hiring restructuring advisors and a bankruptcy filing date of March 15, 2013 unless a capital infusion deal could be reached by that time.  Clear Thinking Group, LLC ("Clear Thinking") was chosen by the Company's management to provide professional restructuring assistance on March 6, 2013 and by March 7, Lee Diercks of Clear Thinking, now the Debtor's Chief Restructuring Officer, was on the ground at the Company's headquarters.  March 8th came and went with no additional forbearance entered into at that time.  In the meantime, the Company relied on daily negotiations with Salus in order to fund its working capital needs.  Finally, on March 15, the Company entered into a second forbearance agreement, which contemplated a chapter 11 filing by March 22, 2013 and provided the Company the financing necessary to fund its legal obligations until that time.

## C.  Lease Negotiations

In connection with the forbearance agreement entered into in February 2013, and the resulting lack of access to the original agreement's $20 million high season cap, the Company began to default more frequently on certain of its rent obligations, including the lease renegotiations handled by Keen Realty Advisors ("Keen").  The Company engaged Keen to lead lease renegotiation discussions with its landlords as occupancy costs were the one remaining aspect of the Company's cost structure that it had not been able to reduce since 2008.  During the four weeks Keen (prepetition) was engaged, the Company negotiated combined lease savings of over $7 million over remaining three-to-five year lease terms.  Approximately, $1.5 million of that savings was expected to be realized in 2013.  However, due to the default on the Salus agreement, and without access to the high season revolver cap from Salus, the Company did not have the available liquidity to make certain negotiated lease reduction payments, thus, jeopardizing the concessions negotiated by Keen.  The negotiated reductions were predicated upon a combination of staying current on future (reduced) rent obligations and/or paying a portion of arrearages.  As mentioned above, given the Debtor's limited access to liquidity, it was a challenge to conform to the negotiated terms.

## D.  DIP Negotiations Prior to Filing

Given the urgency to find an immediate comprehensive liquidity solution, including postpetition financing, over the course of the few weeks prior to the Petition Date, the Debtor's management team, together with Mr. Diercks, had worked to address certain risks presented by a continued deterioration of the Company's liquidity position, including, in particular, the possibility that a liquidity shortfall would force the Debtor to liquidate.  In connection with such efforts, Clear Thinking contacted 12 financial parties, including banks and non-institutional investors resulting in the Company's entry into 6 non-disclosure agreements.

A primary component of such efforts has been discussions with the Company's key stakeholders, including Salus and certain equity holders.  This process involved extensive negotiations between legal and financial advisors for each of these parties and the Company's advisors, as well as a number of presentations and other meetings where members of the Company's senior management team and Clear Thinking met. In the meantime, Clear Thinking

28

continued to have communications with a number of third-parties in connection with obtaining postpetition financing.

In connection with these efforts, the Company logically identified Salus as the most likely source of postpetition financing that could be obtained within the time period imposed by the forbearance agreement and the Company's rapidly dwindling liquidity position, particularly given Salus's liens on substantially all of the Company's assets, history with the Company, and involvement over the past several months with the Company's restructuring efforts. Indeed, in light of the substantially fully encumbered nature of the Company's assets, the prospect of obtaining postpetition financing from a third party lender outside of Salus would have contemplated one of four difficult alternatives: (a) to find a lender willing to extend postpetition financing on an unsecured basis, (b) to find a lender willing to extend postpetition financing with priority junior to that of Salus and the Second Lien Lenders, (c) to obtain postpetition financing that primed Salus's and the Second Lien Lenders' without such parties' consent, or (d) to arrange a refinancing of the Company's prepetition debt. Nonetheless, the Company and its advisors approached third parties to ascertain whether or not such third parties would be willing to provide postpetition financing.

Indeed, given the timing for a filing and the impending liquidity crisis, the Debtor was not able to secure financing proposals from third parties that would provide the Debtor with sufficient liquidity to fund the Chapter 11 Case, including on an unsecured or non-consensual priming basis or on a priority junior to that of the its prepetition lenders.

Accordingly, the Company determined in consultation with Clear Thinking and its legal counsel, that under the circumstances, including the Company's liquidity position, the upcoming forbearance deadline, the current debtor-in-possession financing market, and the results of recent conversations with a variety of stakeholders and other parties, entry into the DIP Credit Agreement was the best option available to the Debtor to provide it with sufficient liquidity to continue to operate its business operations and to conclude its restructuring.

Accordingly, in light of the Debtor's imminent liquidity needs, the Debtor determined that it would not be prudent or productive to delay a chapter 11 filing and risk a lack of funding and liquidity, coupled with potential precipitous action to be taken by Salus, nor would it be prudent to incur further costs or devote additional resources to soliciting interest from potential third party sources of postpetition financing. Rather, the Debtor and its advisors focused their efforts on finalizing and documenting the Salus DIP Facility. Thus, throughout the weeks leading up to the Petition Date, the Debtor and Salus engaged in extensive good faith and arm's length negotiations with respect to the terms and conditions of the postpetition financing. The result of such good faith and arms' length negotiations was the execution of the DIP Credit Agreement submitted to the Bankruptcy Court for approval.

**Section 3.02.**     **The Events Leading to the Formulation of the Plan**

The DIP Credit Agreement contains milestones for the Debtor to run a controlled process by which the Debtor proceed on a dual -track that provides for a reorganization by a date certain, or, in the alternative, a liquidation of the enterprise. The DIP Credit Agreement set forth specific milestones to achieve the reorganization, including entry into a definitive plan term sheet

reasonably acceptable to Salus and the Creditors' Committee. To the extent such milestone was not achieved, the Debtor would be required to pursue a liquidation or sale of its assets in accordance with various other milestones. On account of these requirements, soon after the Creditors' Committee was formed, the Debtor began negotiating in earnest with all of its major constituencies regarding the outlines of a chapter 11 plan. This culminated into the Plan Term Sheet upon which the Plan is based.

If consummated, the restructuring transactions contemplated in the Plan will substantially de-lever the Debtor and provide cost savings, operational efficiency and additional needed liquidity.

**ARTICLE IV**

**ADMINISTRATION OF THE CHAPTER 11 CASE**

**Section 4.01.        Overview of Chapter 11**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Commencement Date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes the obligations specified under the confirmed plan.

In general, a chapter 11 plan of reorganization (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor and that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of the Chapter 11 Case until such time as the court has approved the Disclosure Statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment

30

regarding the plan.  To satisfy applicable disclosure requirements, the Debtor submits the Disclosure Statement to holders of Claims that are impaired and not deemed to have rejected the Plan.

Section 4.02.        Relevant Case Background

On March 24, 2013, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Honorable Peter J. Walsh is presiding over the Chapter 11 Case.  The Debtor continues to operate its business and manage its properties as Debtor and Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.  The Creditors Committee was appointed on April 4, 2013.

The following is a brief description of certain significant events that have occurred during the pendency of the Chapter 11 Case.

1.        Retention of Professionals.

To assist in carrying out its duties as a debtor in possession, and to otherwise represent its interests in the Chapter 11 Case, the Debtor, on March 26, 2013, filed with the Bankruptcy Court applications seeking entry of orders authorizing the Debtor to retain a number of professionals including Lee Diercks as Chief Restructuring Officer (Docket No. 6); Olshan Frome Wolosky LLP as its general and bankruptcy counsel (Docket No. 29) and A.M. Saccullo Legal, LLC as its Delaware local counsel (Docket No. 32).  The Debtor also filed an application on April 5, 2013 to employ Gordon Brothers as consultant with respect to its Closing Market Stores (as defined below) (Docket No. 88) and, on April 12, 2013, to employ GA Keen Realty Advisors, LLC as Special Real Estate Advisor (Docket No. 126).

On April 12, 2013, the Bankruptcy Court entered an order approving the Debtor's retention of Gordon Brothers (Docket No. 124).  On April 29, 2013, the Bankruptcy Court entered orders approving the Debtor's retention of Lee Diercks, Olshan Frome Wolosky LLP and A.M. Saccullo Legal, LLC (Docket Nos. 177, 171 and 169, respectively).  The Bankruptcy Court is scheduled to consider the application to employ GA Keen Realty Advisors, LLC on May 22, 2013.

To assist with its fiduciary responsibilities, on May 1, 2013, the Creditors' Committee also filed with the Bankruptcy Court its application to employ Pachulski Stang Ziehl & Jones LLP as legal counsel to the Creditors' Committee (Docket No. 182) and Gavin/Solmonese LLC as the Creditors' Committee's financial advisor (Docket No. 187).

The Bankruptcy Court is scheduled to consider these Creditor Committee applications on May 22, 2013.

2.        Employment Obligations.

The Debtor believes it has a valuable asset in its workforce, and that the efforts of the Debtor's employees are critical to a successful reorganization.  On March 24, 2013, the Debtor filed with the Bankruptcy Court a motion for an order authorizing the Debtor to pay certain

31

prepetition employee wage and benefit obligations (Docket No. 46).  On March 27, 2013, the Bankruptcy Court entered an order (Docket No. 39) approving the motion.

### 3.    Customer Programs

Maintaining a positive relationship with its customer base is critical to the Debtor's success.  On March 24, 2013, the Debtor filed a motion to authorize the Debtor to continue its customer programs in the ordinary course.  (Docket No. 9).  On March 27, 2013, the Bankruptcy Court entered an order (Docket No. 48) approving the motion.  In reliance on that order, since the Petition Date, the Debtor has satisfied certain customer claims.

### 4.    Cash Management

The Debtor believes it would have been disruptive to its operations if it was forced to change significantly its cash management system upon the commencement of the Chapter 11 Case.  Accordingly, on March 24, 2013, the Debtor filed with the Bankruptcy Court a motion seeking entry of interim and final orders authorizing the Debtor to maintain its current cash management system (Docket No. 11).  On March 27, 2013, the Bankruptcy Court entered an interim order (Docket No. 50) approving the motion, and on April 29 2013, the Bankruptcy court entered a final order (Docket No. 175) approving the motion on a final basis.  Thus the Debtor operates under the cash management system that existed as of the Petition Date.

### 5.    Insurance

On March 24, 2013, the Debtor filed a motion seeking entry of interim and final orders authorizing the Debtor to continue payment of its insurance programs in the ordinary course (Docket No. 8).  On March 27, 2013, the Bankruptcy Court entered an interim order (Docket No. 47) approving the motion, and on April 29, 2013, the Bankruptcy court entered a final order (Docket No. 173) approving the motion on a final basis.

### 6.    Freight Forwarders

On March 24, 2013, the Debtor filed a motion seeking entry of an order authorizing, but not requiring, the Debtor to pay certain prepetition claims of certain of its freight forwarders (Docket No. 10).  On March 27, 2013, the Bankruptcy Court entered an order (Docket No. 49) approving the motion.

### 7.    Utilities

On March 25, 2013, the Debtor filed with the Bankruptcy Court a motion for an order: (i) prohibiting utilities from altering or discontinuing services; (ii) deeming utility companies to have adequate assurance of payment; and (iii) establishing procedures for providing additional adequate assurance of future payment; (iii) and (iv) establishing procedures for resolving requests for additional assurance of payment (Docket No. 19).  On March 27, 2013, the Bankruptcy Court entered an order (Docket No. 53) approving the motion.

### 8.        Prepetition Sales Taxes

On March 27, 2013, the Debtor filed a motion seeking entry of an order authorizing, but the Debtor to pay prepetition sales tax claims (Docket No. 34).  On April 2, 2013, the Bankruptcy Court entered an order (Docket No. 66) approving the motion.

### 9.        The Debtor's Closing Market Stores Motion

As of the Petition Date, the Debtor operated 37 store locations in the Mid-Atlantic and Northeast regions.  The Debtor determined in its business judgment to wind down business operations in its 14 store locations in the Mid-Atlantic, specifically in Delaware, Maryland, New Jersey and Pennsylvania (the "Closing Market Stores") which were underperforming.  By winding down its operations in the Closing Market Stores, the Debtor would be able to (i) maximize value of inventory in the Closing Market Stores (ii) develop a plan to cut its overhead in the Closing Market Stores and (iii) focus its reorganization efforts around its performing locations.  The Debtor sought bids from national liquidator chains to act as a consultant with respect to the wind-down operations in the Closing Market Stores.  On April 8, 2013, the Debtor filed a motion seeking an order authorizing the Debtor to conduct a store closing process in the Closing Market Stores and (as discussed above) retaining Gordon Brothers as its consultant (Docket No. 88).  On April 12, 2013, the Bankruptcy Court entered an order approving the Motion (Docket No. 124).  The Debtor is currently undergoing store closing sales in the Closing Market Stores and is expected to complete the wind-down of its operations in the Closing Market Stores in July, 2013.

### 10.        Non-Residential Real Property Lease Related Motions

The Debtor leases all of its real property.  As part of the Debtor's strategic  and cost-saving reorganization efforts, the Debtor has filed a number of motions related to its leased properties as follows:

**A. Extension of Time to Assume or Reject.**  Section 365 of the Bankruptcy Code grants debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contracts or unexpired lease is rejected, the counterparty to the agreement may file a claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, such damage claims are subject to certain limitations imposed by the Bankruptcy Code.  Under section 365 of the Bankruptcy Code, if a debtor does not assume an unexpired lease of nonresidential property within 120 days of the petition date, such lease will be deemed rejected.  However, section 365 of the Bankruptcy Code also provides that the Bankruptcy Court may extend this period for 90 days (subject to further extensions with landlord consent).  On April 11, 2013, the Debtor filed a motion to extend the deadline to assume or reject unexpired leases of nonresidential real property (Docket No. 121).  On April 29, 2013, the Bankruptcy Court entered an order granting an extension of the Debtor's deadline to assume or reject unexpired leases of nonresidential real property to October 20, 2013 (Docket No. 170).

**B. Lease Rejection Motion.**  As of the Petition Date, the Debtor was a tenant in certain real property spaces that it no longer used.  Thus, on March 24, 2013, the Debtor

filed a motion seeking entry of an order rejecting such leases (and a related executor contract) *nunc pro tunc* to the Petition Date (Docket No. 12).  On March 27, 2013, the Bankruptcy Court entered an order (Docket No. 51) approving the motion.

    **C.  Lease Rejection Procedures**.  On April 11, 2013, the Debtor filed a motion seeking an order that would outline certain procedures pursuant to which the Debtor can reject additional nonresidential real property leases (Docket No. 121).  The Bankruptcy Court is scheduled to hear that Motion on May 22, 2013.

    **11.**  **Schedules and Statements**

    On May 10, 2013, the Debtor filed with the Bankruptcy Court the Schedules and Statement of Financial Affairs (collectively, the "Schedules").

    **12.**  **Section 341 Meeting**

    A meeting of creditors pursuant to section 341(a) of the Bankruptcy Code was originally held on April 30, 2013.  Because the Debtor had not yet filed its schedules and statements, that meeting has been adjourned to May 22, 2013 at 1:30pm.

    **13.**  **Post-petition Financing**

    On March 24, 2013, the Debtor filed the *Motion For Entry Of Interim and Final Orders (1) Authorizing Postpetition Financing, (2) Granting Liens and Providing Super Priority Liens and Administrative Claims (3) Authorizing Use of Cash Collateral and Providing for Adequate Protection, and (4) Modifying Automatic Stay and Pursuant To 11 U.S.C. §§ 105(a), 361 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) And 364(e),* (the "DIP Motion") (Docket No. 5).  By the DIP Motion, the Debtor sought entry of interim and final orders granting the following relief:

 a. authorizing the Debtor to enter into the post-petition Senior Secured, Super Priority Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement"), in order that the Debtor can access the facilities through post-petition advances thereunder, which advances are secured by a senior superpriority, lien in substantially all of the Debtor's collateral pursuant to section 364(c)(3) of the Bankruptcy Code and subject to a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code senior to all other superpriority administrative expense claims;

 b. authorizing the Debtor's use of "cash collateral," as such term is defined in section 363(a) of the Bankruptcy Code;

 c. granting Adequate Protection Liens, Adequate Protection Superpriority Claims, and Adequate Protection Payments (each as defined in the DIP Motion) as adequate protection for the use of the Senior Lenders and Second Lien Lender's prepetition collateral;

 d. vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the interim and final orders; and

34

e. scheduling a final hearing (the "Final Hearing") to consider the relief requested in the DIP Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing.

On March 27, 2013, the Bankruptcy Court entered an order approving the relief requested in the DIP Motion on an interim basis (Docket No. 45), and on May 7, 2013, the Bankruptcy Court entered an order (Docket No. [197]) approving the motion on a final basis.

As set forth above, the DIP Credit Agreement contains milestones that the Debtor run a controlled process by which the Debtor proceed on a dual -track that provides for a reorganization by a date certain, or, in the alternative, a liquidation of the enterprise. The DIP Credit Agreement set forth specific milestones to achieve the reorganization, including entry into a definitive plan term sheet reasonably acceptable to Salus and the Creditors' Committee by April 30, 2013. On account of these requirements, soon after the Creditors' Committee was formed, the Debtor began negotiating in earnest with all of its major constituencies regarding the outlines of a chapter 11 plan. This culminated into the Plan Term Sheet upon which the Plan is based. The Debtor has entered into a series of amendments of the DIP Credit Agreement. Pursuant to the Third Amendment to the DIP Credit Agreement, dated as of May 7, 2013, the DIP Credit Agreement provides that the Debtor pursue a Plan in accordance with certain additional and revised milestones, including filing of a Plan consistent with the Plan Term Sheet by May 20, 2013, and confirmation of a Plan consistent with the Plan Term Sheet by July 31, 2013.

### 14.   The Creditors' Committee

Pursuant to section 1102(a)(1) of the Bankruptcy Code, on April 4, 2013, the United State Trustee for Region 3 (the "U.S. Trustee") appointed the Creditors' Committee. The current members of the Creditors' Committee are set forth below:

**DDR Southeast Hanover, LLC,** Attn: Renee Weiss, 3300 Enterprise Parkway, Beachwood, OH 44122.

**WilBar International**, Attn: Steven Cohen, 50 Cabot Court, Hauppauge NY 11788.

**Asahi Chemical Industry Co., LTD.,** Attn: Noboru Sato, 672-1, Owadshinden, Yachiyo Shi, Chiba Ken, 276-0046 Japan.

**Swinline Corp.**, Attn: Larry Schwimmer, 191 Rodeo Drive, Edgewood NY 11717.

**Vinyl Works Canada,** Attn: Trent Pettit, 2174 Barber Drive, Pt. Colborne ON Can L3K5V5.

**Damco USA**, Attn: Michael Carroll, 2 Giralda Farms, Madison Avenue, Madison NJ 07940.

**John Froman**, 72 Hillburn Lane, North Barrington IL 60010.

Retention of the Creditors' Committee professionals is discussed in above in subparagraph 1.

**Section 4.03.        No Distributions to Equity Interests.**

No Plan Distributions shall be made on account of any Interests in the Debtor regardless of whether such Interests are held by a Person which is not a Debtor.

## ARTICLE V

## SUMMARY OF THE PLAN

**Section 5.01.        Summary**

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN.  THE DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO.**

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class.  The Plan separates the various Claims (other than those that do not need to be classified) into five separate Classes.  These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtor.  Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtor.

The Plan is intended to enable the Debtor to continue its present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization.  The Debtor believes that it will be able to perform all of its obligations under the Plan and meet its expenses after the Effective Date without further financial reorganization.  Also, the Debtor believes that the Plan permits fair and equitable recoveries, while expediting the reorganization of the Debtor.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court.  The Effective Date will be the first Business Day on or after the Confirmation Date on which all of the conditions to the Effective Date specified in Section 12.02 of the Plan have been satisfied or waived and the parties have consummated the transactions contemplated by the Plan.

The Debtor anticipates that the Effective Date will occur in August, 2013.  Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or

Interests.  The Reorganized Debtor will make all payments and other distributions to be made under the Plan unless otherwise specified.

All Claims and Interests, except Administrative Expense Claims, DIP Claims, Fee Claims, United States Trustee Fees, and Priority Tax Claims, are placed in the Classes set forth in Article II of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Fee Claims, Dip Claims, U. S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan.  A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

### Section 5.02.    Provisions for Treatment of Unclassified Claims

### 1.    Administrative Expense Claims.

Except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, or as otherwise provided for in the Plan, the Debtor shall pay to each Holder of an Allowed Administrative Expense Claim Cash in an amount equal to the amount of such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date, (ii) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is reasonably practicable and (iii) the date that such Administrative Expense Claim is due in accordance with its terms; *provided, however*, that Allowed Ordinary Course Administrative Expense Claims may be paid by the Debtor or the Reorganized Debtor in the ordinary course of business of the Debtor or the Reorganized Debtor consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

The Confirmation Order or separate bankruptcy court order will establish the Administrative Expense Claims Bar Date for filing applications for the allowance of Administrative Expense Claims (except for Fee Claims, Ordinary Course Administrative Expense Claims, and United States Trustee Claims).  A notice setting forth the Administrative Expense Claim Bar Date shall be filed on the Bankruptcy Court's docket.  Further notice of the Administrative Expense Claims Bar Date shall be provided as may be directed by the Bankruptcy Court.  All requests for payment of an Administrative Expense Claim that accrued on or before the Effective Date (except for Fee Claims and United States Trustee Claims) must be filed with counsel for the Debtor by the Administrative Expense Claim Bar Date.  Any requests for payment of an Administrative Expense Claim (other than Fee Claims and United States Trustee Claims) that are not properly filed and served by the Administrative Expense Claim Bar Date shall be disallowed automatically without the need for any objection from the Debtor or the Reorganized Debtor or any action by the Bankruptcy Court.  The Reorganized Debtor shall have until 120 days after the Administrative Expense Claims Bar Date (or such longer period as may be allowed by order of the Bankruptcy Court) to review and object to all applications for the allowance of Administrative Expense Claims.  Unless the Debtor or the

Reorganized Debtor objects to a timely-filed and properly served Administrative Expense Claim, such Administrative Expense Claim shall be deemed Allowed in the amount requested.

### 2.    Fee Claims.

Any entity seeking an award by the Bankruptcy Court of compensation or reimbursement of Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall file and serve on the Reorganized Debtor and their counsel, the United States Trustee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or any other order(s) of the Court, its final application for allowance of such compensation and/or reimbursement by no later than sixty (60) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Fee Claims against the Debtor, the Reorganized Debtor or their respective properties, and such Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Fee Claims must be filed and served on the Reorganized Debtor and their counsel and the requesting party no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which an application for final allowance of such Fee Claims was filed and served.

The Reorganized Debtor shall pay each Holder of an Allowed Fee Claim Cash in an amount equal to the amount of such unpaid Allowed Fee Claim on the date such Fee Claim becomes an Allowed Fee Claim or as soon thereafter as is reasonably practicable.

### 3.    United States Trustee Fees

On the Effective Date or as soon as practicable thereafter, the Debtor or the Reorganized Debtor shall pay all United States Trustee Fees.

### 4.    DIP Claims

On or prior to the Effective Date, the DIP Claims will be indefeasibly paid and satisfied, in full, in Cash, by the Debtor or the Reorganized Debtor, and after the DIP Claims are satisfied, all liens granted to the DIP Lender in connection with the DIP Credit Agreement shall be terminated without further action by the Debtor or the Reorganized Debtor or further order of the Bankruptcy Court.

### 5.    Priority Tax Claims.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a different treatment, or the Bankruptcy Court has previously ordered otherwise, each Holder of an Allowed Priority Tax Claim shall receive, in full and complete satisfaction, settlement, and release of, and in exchange for such Allowed Priority Tax Claim, at the sole option of the Reorganized Debtor, (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed

Priority Tax Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled to be calculated in accordance with section 511 of the Bankruptcy Code). All Allowed Priority Tax Claims which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business. The Reorganized Debtor shall retain the right to pay any Allowed Priority Tax Claim, or any remaining balance of such claim, in full at any time without premium or penalty.

### Section 5.03.        Provisions for Treatment of Classified Claims.

### 1.        Class 1 – Priority Non-Tax Claims.

A.        Treatment.   The legal, equitable and contractual rights of the Holders of Class 1 Claims are unaltered by the Plan.  Except to the extent a Holder of a Priority Non-Tax Claim agrees to different treatment, each Holder of an Allowed Priority Non-Tax Claim will be paid, in full and complete satisfaction, settlement, and release of and in exchange for such Allowed Priority Non-Tax Claim, the Allowed Amount of such Allowed Priority Non-Tax Claim in full in Cash on the later of the Effective Date and the first Distribution Date subsequent to the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim.

B.        Voting.  Class 1 is unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the Holders of Allowed Priority Non-Tax Claims are conclusively presumed to accept the Plan and the votes of such Holders will not be solicited with respect to such Allowed Priority Non-Tax Claims.

### 2.        Class 2 – Senior Lender Claims.

A.        Allowance.  On the Effective Date, Senior Lender Claims shall be deemed Allowed in the aggregate approximate amount of $9,304,025 as of the Petition Date, plus any accrued interest, fees, and expenses, and less all amounts paid by the Debtor on account of such Allowed Senior Lender Claims prior to the Effective Date.

B.        Treatment.  To the extent not satisfied in full prior to the Effective Date, the Senior Lender Claims will be indefeasibly paid and satisfied, in full, in Cash on the Effective Date and after the Senior Lender Claims are satisfied, all liens granted to the Senior Lender in connection with the Senior Lender Credit Agreement shall be terminated without further action by the Debtors or the Reorganized Debtor or further order of the Bankruptcy Court.

C.        Voting. Class 2 is unimpaired. The Holder of the Senior Lender Claims is not entitled to vote to accept or reject the Plan.  In accordance with section 1126(f) of the Bankruptcy Code, the Holder of Senior Lender Claims is conclusively presumed to accept the Plan and the vote of such Holder will not be solicited with respect to such Allowed Senior Lender Claims.

3.      **Class 3 – Second Lien Claims.**

A.      <u>Allowance</u>.  On the Effective Date, Second Lien Claims shall be deemed Allowed in the aggregate amount of $9,256,985.30, plus all reasonable costs and expenses payable thereunder, provided such costs and expenses shall not exceed $250,000.

B.      <u>Treatment</u>.  The Collateral Agent, on behalf of holders of Allowed Second Lien Claims, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Second Lien Claims, on the Effective Date will receive (i) the Second Lien Lender Note, (ii) cash on the effective date equal to the reasonable costs and expenses of the Collateral Agent, and (iii) an Allowed Class 3 General Unsecured claim equal to $3,265,000, each of the foregoing subject, in all respects, to the indefeasible payment in full of the DIP Claims and the Senior Lender Claims.  Notwithstanding anything else herein to the contrary, the Plan shall give effect to all subordination, intercreditor, pledge and sharing agreements (together, the "Subordination Agreements") as set forth in section 510 of the Bankruptcy Code, and all payments set forth herein shall be made in accordance with the terms of such Subordination Agreements, and shall be deemed to have been made as set forth above.

C.      <u>Voting</u>. Class 3 is impaired.  The Holders of Allowed Second Lien Claims are entitled to vote to accept or reject the Plan.

4.      **Class 4 – General Unsecured Claims**

A.      <u>Treatment</u>.  Each Holder of an Allowed General Unsecured Claim shall receive, in full and complete satisfaction, settlement and release of and in exchange for such Allowed General Unsecured Claim its pro rata share of (i) the GUC Note which shall be payable over three years from the Effective Date as follows: (a) $500,000 cash distribution on the Effective Date, and (b) in an amount equal to one third of the remaining principal amount of the note on each anniversary of the Effective Date thereafter; and (ii) a contingent note in an amount equal to 5% of the net proceeds over $30,000,000 from a sale of the Reorganized Debtor; provided, however, such contingent note shall be payable if and only if the Reorganized Debtor is sold for more than $30,000,000 within three years of the Effective Date.

B.      <u>Voting</u>. Class 4 is Impaired. The Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.      **Class 5 – Existing Equity Interests.**

A.      <u>Treatment</u>.  Each Holder of the Debtor's Existing Equity Units, as well as any options, warrants or similar instruments derived from or relating to any such common or preferred interests shall not receive or retain any property or interests on account of such interest, and any such interests shall be cancelled and extinguished on the Effective Date.

B.      <u>Voting</u>. In accordance with section 1126(g) of the Bankruptcy Code, the Holders of the Debtor's Existing Equity Units are conclusively presumed to reject the Plan and the votes of such Holders will not be solicited with respect to such Existing Equity Units.

**Section 5.04.**        **Acceptance or Rejection of the Plan**

  **1.**        **Each Impaired Class Entitled to Vote Separately**

Each Impaired Class of Claims that is to receive a Distribution under the Plan will be entitled to vote separately to accept or reject the Plan.  Except as provided herein, each Person that, as of the Voting Record Date, holds a Claim in an Impaired Class will receive a Ballot that will be used to cast its vote to accept or reject the Plan.  In the event of a controversy as to whether any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

  **2.**        **Acceptance by a Class of Claims**

An Impaired Class of Claims will be deemed to accept the Plan if the Plan is accepted by the Holders of Claims in such Class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

  **3.**        **Unimpaired Classes of Claims.**

The following Classes of Claims are unimpaired and, therefore, deemed to have accepted the Plan and are not entitled to vote on the Plan under section 1126(f) of the Bankruptcy Code.

    Class 1: Priority Non-Tax Claims

    Class 2 Senior Lender Claims

  **4.**        **Impaired Classes of Claims and Interests.**

The following Classes of Claims are impaired and entitled to vote on the Plan:

    Class 3: Second Lien Claims

    Class 4: General Unsecured Claims

The following Class of Interests is impaired and deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan under section 1126(g) of the Bankruptcy Code:

    Class 5: Existing Equity Units

**Section 5.05.**        **"Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown"**

Because certain Classes are deemed to have rejected the Plan, the Debtor will seek confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtor, with the consent of the Plan Sponsors and the Creditors' Committee (and, to the extent their Claims have not been fully satisfied, the Senior Lender and the DIP Lender) which consent shall not be unreasonably withheld, reserves the right to alter,

amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

> ### Section 5.06.    Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

## ARTICLE VI

## MEANS OF PLAN IMPLEMENTATION

> ### Section 6.01.    Introduction

The Plan will be implemented through a restructuring of the Debtor's debt obligations. The Existing Equity Interests will be canceled and New Equity Units will be issued to the Plan Sponsors in exchange for working capital commitments of up to $3,000,000.  General Unsecured Creditors will each receive a distribution on account of their Allowed Claims, as discussed in Article III.  The following discussion outlines the general terms of the contemplated reorganization of the Debtor and certain actions that will be taken to close the transactions contemplated by the Plan.

> ### Section 6.02.    Corporate Action Non-Voting Securities.

On and after the Effective Date, the Reorganized Debtor shall have full authority and is authorized to take such actions and execute such documents as may be necessary to effectuate the transactions provided for in the Plan, including, without limitation, (i) assumption and rejection of Executory Contracts and unexpired leases, (ii), subject to the Amended Operating Agreement, selection of the managers and officers of the Reorganized Debtor, (iii) the execution and entry into the Exit Facility Agreement, and (iv) the issuance and distribution of the New Equity Units.  The Reorganized Debtor's post-Effective Date authority shall further include, without limitation, the right to operate its business as a going concern; to purchase and/or sell assets; to commence and prosecute actions and proceedings; to open, maintain and close bank accounts and/or other investments; to make and File Objections to, or otherwise contest the amount, validity and/or priority of, all Claims; to calculate and make Distributions consistent with the Plan; to prosecute and resolve Objections regarding all Claims; to engage in arbitration or mediation; to engage or retain Professionals and to pay the fees and disbursements thereof; to file tax information and returns as required and, in connection therewith, to make such determinations of tax liability, challenge assessments, make tax elections, pay taxes and take other, related actions; to hold and dispose of any unclaimed Distributions; and to close the case and any related proceedings.

On and after the Effective Date, the Reorganized Debtor is authorized to, and may direct an officer to, issue, execute, deliver, file, or record such contracts, securities, instruments,

releases, and other agreements or documents and take such action as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of, and on behalf of the Reorganized Debtor without the need for any approvals, authorizations, or consents except for those required pursuant to the Plan.

### Section 6.03.     Effective Date Transactions

### 1.     Issuance of the New Equity Units

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor shall authorize the issuance of the New Equity Units according to the distribution schedule set forth in the Plan Supplement.  The issuance of the New Equity Units is authorized without the need for any further corporate action or any further action by any Holder of Claims or Interests.

All of the New Equity Units issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable.

### 2.     Exit Facility

On the Effective Date, the Reorganized Debtor shall be authorized, but not required, to enter into the Exit Facility. Confirmation shall be deemed approval of the Exit Facility, if any, (including the transactions contemplated thereby, such as any supplemental or additional syndication of the Exit Facility, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtor to enter into and execute the Exit Facility, if any, and such other documents as the Exit Facility Lenders may require, subject to such modifications as the Reorganized Debtor may deem to be reasonably necessary to consummate the Exit Facility.  The Reorganized Debtor may use the Exit Facility for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs.

### Section 6.04.     Securities Registration Exemption

The New Equity Units are to be issued pursuant to the Plan without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.  The New Equity Units to be issued pursuant to the Plan are to be issued by the Reorganized Debtor without registration under the Securities Act or any similar federal, state or local law in reliance upon the exemptions set forth in section 1145 of the Bankruptcy Code.  To the extent section 1145 of the Bankruptcy Code is inapplicable, the issuance of the New Equity Units shall be exempt from registration under the Securities Act or any similar federal, state or local law in reliance on the exemption set forth in section 4(2) of the Securities Act or Regulation D promulgated thereunder.

### Section 6.05.          Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in the Plan or the Confirmation Order or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in the Debtor's Estate, including the Retained Causes of Action, and any property acquired by any of the Debtor pursuant to the Plan shall vest in the Reorganized Debtor free and clear of all Liens, Claims, charges, or other encumbrances (other than the liens associated with the Second Lien Lender Note and the Exit Facility).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Retained Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### Section 6.06.          Corporate Governance

On and after the Effective Date, (i) the Board of Managers of the Reorganized Debtor shall consist of members to be determined by Plan Sponsors and as disclosed in the Plan Supplement, and (ii) the Reorganized Debtor shall be managed in accordance with the Amended Operating Agreement.

### Section 6.07.          Cancellation of Existing Securities and Agreements

On the Effective Date, the Existing Equity Interests in the Debtor shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.  Similarly, on the Effective Date, except (a) as otherwise specifically provided for in the Plan with respect to Executory Contracts or unexpired leases that have been assumed by the Debtor, with respect to any Claim that is Allowed under the Plan, on the Effective Date, any instruments or documents evidencing any Claims or Interests shall be deemed automatically canceled and deemed surrendered without further act or action under any applicable agreement, law, regulation, order, or rule and the obligations of the Debtor under the agreements, instruments, and other documents, indentures, and certificates of designations governing such Claims and Interests, as the case may be, shall be discharged; *provided*, *however*, that such instruments or documents shall continue in effect solely for the purpose of (x) allowing the Holders of such Allowed Claims to receive their Distribution under the Plan, and (y) allowing the Disbursing Agent to make such Distributions to made on account of such Allowed Claims; *provided, further, however*, that the preceding provisions shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or otherwise result in any expense or liability to the Reorganized Debtor.

### Section 6.08.          Obligations Incurred After the Effective Date

Payment obligations incurred after the Effective Date, including, without limitation, the professional fees of the Debtor and professionals of the Creditors' Committee solely with respect to the prosecution of their final fee applications, will not be subject to application or proof of claim and may be paid by the Reorganized Debtor in the ordinary course of business and without further Bankruptcy Court approval.

**Section 6.09.        General Unsecured Claims Administrator**

Commencing six months after the Effective Date and thereafter until the GUC Note is paid in full, the General Unsecured Claims Administrator shall receive reporting every six (6) months in the form of the Reorganized Debtor's sales, gross margins and EBITDA for the year-to-date period, and, with the exception of any Distribution occurring on or about or prior to the Effective Date, at least ten (10) business days' notice prior to any Distribution required to be made under the Plan.

The General Unsecured Claims Administrator shall be compensated by the Reorganized Debtor at the fixed amount of $20,000 and shall be entitled to look to the GUC Note proceeds for any additional fees and costs incurred in excess of $20,000.  The General Unsecured Claims Administrator shall serve until the later of (i) three years from the Effective Date; or (ii) the final Distribution Date with respect to Allowed General Unsecured Claims (the "Termination Date"). Ninety-one (91) days after the Termination Date, the General Unsecured Claims Administrator shall be discharged and relieved of all duties under the Plan.  If the General Unsecured Claims Administrator shall become unable to serve or resigns prior to the Termination Date, the Reorganized Debtor shall elect an alternate General Unsecured Claims Administrator.

**Section 6.10.        Post-Confirmation Operating Reports and United States Trustee Fees.**

The Reorganized Debtor shall be responsible for the preparation and filing of operating reports until entry of a final decree in this case.  Quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930 and any applicable interest thereon shall be paid by the Reorganized Debtor until the Effective Date.

## ARTICLE VII

## PRESERVATION AND PROSECUTION OF CAUSES OF ACTION HELD BY THE DEBTOR

**Section 7.01.        Release of Avoidance Actions**

On the Effective Date, the Debtor shall release any and all Avoidance Actions and the Debtor and the Reorganized Debtor, and any of their successors or assigns.  Any Entity acting on behalf of the Debtor or the Reorganized Debtor shall be deemed to have waived the right to pursue any and all Avoidance Actions.   No Avoidance Actions shall revert to creditors of the Debtor.

**Section 7.02.        Preservation and Prosecution of Causes of Action.**

As of the Effective Date, the Debtor shall waive and shall be deemed to have waived all Avoidance Actions, all Claims against Released Parties  to the extent set forth in Article X of the Plan and all other claims and causes of action specifically set forth in the Plan; provided, however, the Debtor and the Reorganized Debtor shall reserve the right to assert such actions, except for Avoidance Actions, as a defense to the allowance of a claim, upon consultation with

45

the Creditor's Committee. All Claims and Causes of Action, with the exception of Avoidance Actions and Claims against Released Parties, are preserved. The Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action. The Reorganized Debtor's right to commence, prosecute, settle, or abandon their Retained Causes of Action shall be preserved, notwithstanding the occurrence of the Effective Date. No entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Retained Cause of Action against them as any indication that the Debtor will not pursue any and all available Retained Causes of Action against them. Unless any Retained Causes of Action against an entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Debtor expressly reserves all Retained Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Retained Causes of Action upon, after, or as a consequence of the Confirmation Order. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Retained Causes of Action against any entity shall vest in the Reorganized Debtor.

Except as explicitly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses that the Debtor or the Reorganized Debtor may have (not including, for avoidance of doubt, any cause of action to avoid a transfer under sections 303(c), 544, 547, 548 or 553(b) of the Bankruptcy Code, or any similar state law), or which the Reorganized Debtor may choose to assert on behalf of the Estate under any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, (i) any and all Claims against any Person or entity, to the extent such Person or entity asserts a cross-claim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtor or the Reorganized Debtor, and (ii) the turnover of any property of the Debtor's Estate.

Except as explicitly provided in the Plan or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses (not including, for avoidance of doubt, any cause of action to avoid a transfer under sections 303(c), 544, 547, 548 or 553(b) of the Bankruptcy Code, or any similar state law) that the Debtor had immediately prior to the Petition Date against or with respect to any Claim left Unimpaired. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such Claims, Retained Causes of Action, rights of setoff and other legal or equitable defenses which they had immediately prior to the Petition Date fully as if the Chapter 11 Case had not been commenced.

The Reorganized Debtor reserves and shall retain the foregoing Retained Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or unexpired lease during the Chapter 11 Case or pursuant to the Plan.

46

**Section 7.03.        Objections to Claims.**

Subject to the consultation and monitoring rights of the General Unsecured Claims Administrator in Section 5.09 above with respect to General Unsecured Claims only, as of the Effective Date, the Reorganized Debtor will have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to the allowance of General Unsecured Claims, other than Claims expressly Allowed under the Plan, on all available grounds, together with all defenses of the Debtor and its Estate, including, without limitation, the defense of setoff as may be necessary within the reasonable judgment of the Reorganized Debtor.   At the request of the General Unsecured Claims Administrator, the Reorganized Debtor shall file any objections to General Unsecured Claims as the General Unsecured Claims Administrator may reasonably determine is necessary.   The Reorganized Debtor shall have the exclusive authority to file, settle, withdraw or litigate to judgment any objections to the allowance of Administrative Claims, Priority Tax Claims and Other Priority Claims, with respect to which it disputes liability, priority, and/or amount.   All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; *provided, however,* that the Reorganized Debtor shall have authority to file, settle, compromise or withdraw any objections to Claims.   Any Objections to Claims that have been filed on or before the Confirmation Date, shall be served and filed as soon as practicable, but, in each instance, no later than: (a) 180 days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof.   The Filing of a motion to extend such objection deadline shall automatically extend such deadline until a Final Order is entered on such motion.   In the event that such a motion to extend the objection deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, such objection deadline shall be the later of the current deadline (as previously extended, as applicable) or 30 days after entry of a Final Order denying the motion to extend the objection deadline.

**Section 7.04.        No Payment or Distribution Pending Allowance.**

Notwithstanding any other provision in the Plan, if any portion of a Claim is a Disputed Claim, no payment or Distribution of Property provided for under the Plan shall be made on account of such Claim unless and until the Disputed Claim becomes an Allowed Claim.   To the extent a Disputed Claim is Disallowed in whole or in part, the Holder of such Claim will not receive any Distribution on account of the portion of such Claim (including the whole, if applicable) that is Disallowed.

**Section 7.05.        Estimation.**

The Reorganized Debtor shall have the right, but not the obligation, at any time to seek an order of the Bankruptcy Court, after notice and a hearing (which notice may be limited to the Holder of a Disputed Claim and the United States Trustee, and which hearing may be held on an expedited basis), estimating for final Distribution purposes any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Reorganized Debtor previously objected to such Claim.   If the Bankruptcy Court estimates any contingent, Disputed or unliquidated Claim, the estimated amount shall constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, *provided*, *however*, that if the estimate constitutes the

47

maximum limitation on such Claim, the Debtor or the Reorganized Debtor may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.  On or after the Confirmation Date, Claims that have been estimated may be compromised, settled, withdrawn, or otherwise resolved subsequently, without further order of the Bankruptcy Court.

## ARTICLE VIII

## DISTRIBUTIONS UNDER THE PLAN

### Section 8.01.        Limitation to Full Recovery

Notwithstanding anything herein to the contrary, no Holder of any Claim will be entitled to a Distribution in excess of 100% of the Allowed amount of its Claim.

### Section 8.02.        Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent will be the Reorganized Debtor or its agent, and shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  The Disbursing Agent need not apply to the Bankruptcy Court for the payment of any fees or expenses from the Reorganized Debtor.

### Section 8.03.        Timing of Distributions.

Distributions under the Plan shall be made (i) as set forth in the Plan or as soon as reasonably practicable thereafter; or (ii) as agreed between the Debtor or the Reorganized Debtor, as applicable, and the particular Creditor, or as soon as reasonably practicable thereafter.

### Section 8.04.        Saturdays, Sundays, or Legal Holidays.

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

### Section 8.05.        Distribution Record Date.

Except as otherwise provided in a Final Order that is not subject to any stay, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 and Filed with the Bankruptcy Court on or prior to the Distribution Record Date will be treated as the Holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer may not have expired by the Distribution Record Date.  As of the close of business on the Distribution Record Date, any transfer ledgers, transfer books, registers and any other records will be closed and, for purposes of the Plan, there shall be no further changes in the record Holders of such Claims.  The Debtor shall have no obligation to recognize the transfer of any Claim occurring after the Distribution Record Date, and will be entitled for all purposes to recognize and deal only with those Holders of Claims and Interests as of the close of

business on the Distribution Record Date, as reflected on the ledgers, books, registers or records of the Debtor and the Bankruptcy Court.

> **Section 8.06.    Delivery of Distributions.**

Subject to the treatment of Disputed Distributions as set forth in Article VII of the Plan, Distributions shall be made to Holders of Allowed Claims at the addresses set forth on the Debtor's books and records or the Proofs of Claim, if any, Filed by such Creditors or at the last known addresses of such Creditors or, in the case of transferred Claims, on the notice of transfer Filed with the Bankruptcy Court pursuant to Bankruptcy Rule 3001, each as of the Distribution Record Date.  If any such Creditor's Distribution is returned as undeliverable, no further Distribution shall be made to such Creditor unless and until the Debtor are notified of such Creditor's then-current address, at which time any missed Distribution shall be made to such Creditor to the extent of available Cash; *provided* that in no event is the Debtor required to make Distributions to a Creditor whose Distribution is returned as undeliverable and becomes Unclaimed Property (as discussed in section 9.07 hereof).

> **Section 8.07.    Method of Cash Distributions.**

The Disbursing Agent shall make all Distributions contemplated by the Plan.  Any Cash payment to be made pursuant to the Plan shall be made by check drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Disbursing Agent.  If a Creditor holds more than one Claim in any one Class, all Allowed Claims of the Creditor in that Class may, at the Debtor's option, be aggregated and one Distribution may be made with respect thereto.

> **Section 8.08.    Unclaimed Property.**

All Property distributed on account of Claims must be claimed within the later of ninety (90) days after (i) the Distribution Date and (ii) the date such Distribution is made to such Holder *provided, however*, in the case of a Distribution made in the form of a check, must be negotiated or a request for reissuance made directly to the Debtor by the Creditor that was originally issued such check and shall be made within ninety (90) days after the date the Distribution is made to the applicable Creditor.  Nothing contained in the Plan shall require the Debtor to attempt to locate any Holder of an Allowed Claim, other than as provided therein.  Pursuant to Bankruptcy Code sections 347(b) and 1143, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed is forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtor or the Estate.  Unclaimed Property of a particular Creditor shall be distributed to Holders of Allowed Claims in the same Class as such Creditor on the next applicable Distribution Date on a pro rata basis.

Unclaimed Property of a particular Creditor shall be distributed to Holders of Allowed Claims in the same Class as such Creditor on the next applicable Distribution Date on a pro rata basis.  Notwithstanding anything to the contrary herein, the Reorganized Debtor is not obligated to make any additional distributions if it is determined, in consultation with the GUC Administrator, that there is insufficient Distributable Cash to make a cost-effective distribution, taking into account the size of the distribution to be made and the number of recipients of such

distribution, in which event, any remaining funds shall be distributed to a charitable organization to be chosen at the reasonable discretion of the GUC Administrator.

### Section 8.09.    Compliance with Tax Requirements.

In connection with each Distribution with respect to which the filing of an information return (such as an IRS Form 1099 or 1042) or withholding is required, the Debtor shall file such information return with the IRS and provide any required statements in connection therewith to the recipients of such Distribution or effect any such withholding and deposit all moneys so withheld as required by law. With respect to any Person from whom a tax identification number, certified tax identification number or other tax information required by law to avoid withholding has not been received by the Debtor within thirty (30) days from the date of any such request, the Debtor may, at its option, withhold the amount required and distribute the balance to such Person or decline to make such Distribution until the information is received.

### Section 8.10.    Setoffs.

Except as otherwise provided in the Plan, the Confirmation Order, or in an agreement approved by a Final Order of the Bankruptcy Court, the Debtor or the Reorganized Debtor, as applicable, may, pursuant to applicable law (including section 553 of the Bankruptcy Code), setoff against any Distribution amounts related to any Claim before any Distribution is made on account of such Claim, any and all of the Claims, rights and causes of action of any nature that the Debtor, the Estate or the Reorganized Debtor may hold against the Holder of such Claim, *provided, however,* that neither the failure to effect such a setoff, the allowance of any Claim thereunder, any other act or omission of the Debtor or the Disbursing Agent, nor any provision of the Plan (other than Article X of the Plan) will constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, rights or causes of action that the Debtor or the Reorganized Debtor may possess against such Holder. To the extent the Debtor or the Reorganized Debtor fail to set off against a Holder and seeks to collect a claim from such Holder after a Distribution to such Holder has been made pursuant to the Plan, the Reorganized Debtor, if successful in asserting such claim, will be entitled to full recovery on the Claim against such Holder.

### Section 8.11.    Documentation Necessary to Release Lien.

Each Creditor who is a Holder of a Lien satisfied, discharged and released under the Plan and who is to receive a Distribution under the Plan, following the receipt of such Distribution, shall deliver any documents necessary to release all Liens arising under any applicable security agreement or non-bankruptcy law (in recordable form, if appropriate) in connection with such Claim and such other documents as the Debtor or Reorganized Debtor may reasonably request to document satisfaction of the Lien, provided however, that Debtor or Reorganized Debtor, as applicable, will bear the reasonable costs of the Senior Lender and the DIP Lender in connection with such release of their Liens if any.

**Section 8.12.        Distributions Under Twenty-Five Dollars**

No Distribution of Cash in an amount of less than twenty-five dollars ($25.00) will be made by the Disbursing Agent to any Holder of an allowed Claim in the aggregate.  In the case of Distributions to Allowed General Unsecured Claims, no interim Distribution shall be made in an amount of less than twenty-five dollars ($25.00), provided however that the amount of such interim Distributions less than twenty-five dollars ($25.00) shall be credited towards future interim or final Distributions.

## ARTICLE IX

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES; INDEMNIFICATION OBLIGATIONS

**Section 9.01.        General Treatment.**

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all Executory Contracts and unexpired leases to which the Debtor is a party shall be deemed assumed, except for any Executory Contracts or unexpired leases that: (a) previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) are designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, if any; or (c) are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date.  Any Schedule of Rejected Contracts and Leases may be revised by the Debtor, with the consent of the Plan Sponsors, to and including the Confirmation Date.  As of and subject to the occurrence of the Effective Date, all contracts identified on the Schedule of Rejected Contracts and Leases shall be deemed rejected.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise specified in writing, each Executory Contract and unexpired lease to be assumed or rejected shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and unexpired lease.  Each Executory Contract and unexpired lease assumed pursuant to this Section 9.01 shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

**Section 9.02.        Cure and Cure Objections.**

(a)        Except to the extent that less favorable treatment has been agreed to by the non-Debtor party or parties to each such Executory Contract or unexpired lease, any monetary defaults arising under each Executory Contract and unexpired lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the appropriate amount (the "Cure Amount") in Cash on the later of thirty (30) days after (i) the Effective Date or (ii) the date on which the Cure Amount has been resolved (either consensually or through judicial decision).

(b)      No later than the date of the filing of the Plan Supplement, the Debtor shall file and serve a schedule (the "Cure Schedule") setting forth the Cure Amount, if any, for each Executory Contract or unexpired lease to be assumed pursuant to Article IX of the Plan.  The Cure Amount for any Executory Contract or unexpired lease not on the Cure Schedule shall be zero.  Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within twenty (20) days of the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any Claim against the Debtor arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

(c)      Any party wishing to object to the assumption of any Executory Contract or unexpired lease under the Plan must follow the instruction described in the Order approving the Disclosure Statement and include a copy of the Executory Contract or unexpired lease to which such objection relates or contain information in detail such that the Debtor may readily identify such Executory Contract or unexpired lease.  Any counterparty that does not object to the assumption of the Executory Contract or unexpired lease under the Plan shall be deemed to have consented to such assumption.

(d)      In the event of a dispute (each, a "Cure Dispute") regarding: (i) the Cure Amount; (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to the proposed assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving such Cure Dispute and approving the assumption.  To the extent a Cure Dispute relates solely to the Cure Amount, the Debtor may, but is not required to, assume the applicable contract or lease prior to the resolution of the Cure Dispute provided that the Debtor reserves Cash in an amount sufficient to pay the full amount asserted as cure payment by the non-Debtor party to such contract or lease (or such smaller amount as may be fixed or estimated by the Bankruptcy Court).  To the extent a Cure Dispute relates to the Debtor's ability to assume the Executory Contract or unexpired lease, the Debtor or the Reorganized Debtor (as the case may be) may, with the consent of the Plan Sponsors, move such Executory Contract or unexpired lease to the Schedule of Rejected Contracts and Leases within two Business Days following the entry of the Final Order with respect to the Cure Dispute.

### Section 9.03.      Assumption Conditioned upon Consummation of The Plan.

The Plan seeks to cause the Debtor and the Reorganized Debtor to assume the relevant contracts on the Effective Date to the extent, and only to the extent, that such contracts or leases constitute Executory Contracts or unexpired leases.  Additionally, unless the assumption, or assumption and assignment, of an assumed contract is expressly approved by a Final Order of the Bankruptcy Court that provided otherwise, the assumption of each contract by the Debtor or the Reorganized Debtor is expressly conditioned upon the occurrence of the Effective Date.  If the Effective Date does not occur, assumption of the contracts as provided in the Plan will not be effective, and the Debtor will retain all of its rights under section 365 of the Bankruptcy Code with respect to such contracts and leases.

**Section 9.04.          Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**

Claims arising out of the rejection of an Executory Contract or unexpired lease pursuant to Article IX of the Plan must be filed with the Bankruptcy Court and served upon the Debtor (or, on and after the Effective Date, the Reorganized Debtor) no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such Executory Contract or unexpired lease, and (ii) notice of entry of the Confirmation Order.  Such Claims shall be treated as General Unsecured Claims.  All such Claims not filed within such time will be forever barred from assertion against the Debtor and its Estate or the Reorganized Debtor and its Property.

Nothing set forth in the Plan shall be deemed to extend any deadline or bar date for the filing of rejection damages claims that were established by any prior Order of this Court.

**Section 9.05.          Treatment of Rejection Claims.**

Any Allowed Claim arising out of the rejection of an Executory Contract or unexpired lease pursuant to the Plan (as opposed to a separate order of the Bankruptcy Court) shall, pursuant to section 502(g) of the Bankruptcy Code, be a General Unsecured Claim.

**Section 9.06.          Reinstatement and Continuation of Insurance Policies.**

Unless otherwise assumed during the pendency of the Chapter 11 Case, from and after the Effective Date, each of the Debtor's insurance policies in existence on and as of the Confirmation Date shall be reinstated and continued in accordance with its terms and, to the extent applicable, shall be deemed assumed by the Reorganized Debtor pursuant to section 365 of the Bankruptcy Code.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtor may hold against any entity, including, without limitation, the insurer under any of the Debtor's insurance policies.

The Debtor's discharge and release from all Claims and Interests, as provided in the Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtor, the Reorganized Debtor, or any other person or entity.

## ARTICLE X

## EFFECT OF CONFIRMATION

**Section 10.01.          Binding Effect.**

The Plan shall be binding and inure to the benefit of the Debtor, all Holders of Claims and Interests, and their respective successors and assigns.

**Section 10.02.          Continued Corporate Existence.**

Except as otherwise provided in the Plan, the Debtor shall continue to exist after the Effective Date as a separate legal entity, pursuant to the laws of the State of Delaware and the terms of the Amended Operating Agreement.

**Section 10.03.        Vesting of Property.**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the Property of the Estate shall vest in the Reorganized Debtor free and clear of all Claims, Liens, encumbrances, charges, and other Interests, except as provided in the Plan or in the Confirmation Order.  From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

**Section 10.04.        Discharge of Claims Against and Interests in the Debtor.**

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a Holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such Holder shall be deemed to have forever waived, released, and discharged the Debtor, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such Holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in the Debtor.

**Section 10.05.        Injunction Against Interference With Plan.**

Upon the entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**Section 10.06.        Injunction.**

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, THE CONFIRMATION ORDER, OR SUCH OTHER ORDER OF THE BANKRUPTCY COURT THAT MAY BE APPLICABLE, AS OF THE EFFECTIVE DATE, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTOR OR ITS ESTATE THAT ARE DISCHARGED PURSUANT TO THE PLAN ARE, WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS, PERMANENTLY ENJOINED FROM AND AFTER THE EFFECTIVE DATE FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) ON ANY SUCH CLAIM OR INTEREST AGAINST OR AFFECTING THE DEBTOR, THE REORGANIZED DEBTOR, THE ESTATE, OR ANY OF THEIR PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN**

54

INTEREST TO, ANY OF THE FOREGOING PERSONS OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (II) ENFORCING, LEVYING, ATTACHING (INCLUDING, WITHOUT LIMITATION, ANY PRE-JUDGMENT ATTACHMENT), COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, WHETHER DIRECTLY OR INDIRECTLY, ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE ESTATE, OR ANY OF THE DEBTOR'S PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR DIRECT OR INDIRECT SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS, OR ANY PROPERTY OF ANY SUCH TRANSFEREE OR SUCCESSOR; (III) CREATING, PERFECTING OR OTHERWISE ENFORCING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY ENCUMBRANCE OF ANY KIND AGAINST THE DEBTOR, THE REORGANIZED DEBTOR, THE ESTATE, OR ANY OF THEIR PROPERTY, OR ANY DIRECT OR INDIRECT TRANSFEREE OF ANY PROPERTY OF, OR SUCCESSOR IN INTEREST TO, ANY OF THE FOREGOING PERSONS; (IV) ACTING OR PROCEEDING IN ANY MANNER, IN ANY PLACE WHATSOEVER, THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW; AND (V) COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY ACTION THAT DOES NOT COMPLY WITH OR IS INCONSISTENT WITH THE PROVISIONS OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING CONTAINED IN THE PLAN SHALL PRECLUDE SUCH PERSONS FROM EXERCISING THEIR RIGHTS, OR OBTAINING BENEFITS, PURSUANT TO AND CONSISTENT WITH THE TERMS OF THE PLAN.  SUCH INJUNCTION SHALL EXTEND TO ALL SUCCESSORS OF THE DEBTOR AND DEBTOR IN POSSESSION, AND THE CREDITORS' COMMITTEE AND ITS RESPECTIVE MEMBERS AND THE PLAN SPONSORS, THE SENIOR LENDER AND THE DIP LENDER.

    Section 10.07.    Releases.

    (A)    EACH CREDITOR FOR ITSELF AND EACH OF ITS RESPECTIVE TRUSTEES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, EMPLOYEES, AGENTS, ATTORNEYS, LEGAL REPRESENTATIVES, PROFESSIONALS, PARENTS, SUBSIDIARIES, EQUITY HOLDERS, MEMBERS, OFFICERS, DIRECTORS, MANAGERS AND ANY OTHER PERSON ACTING FOR OR ON BEHALF OF IT (COLLECTIVELY, THE "RELEASING PARTIES"), RELEASES, ACQUITS AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES AND EACH OF THEIR RESPECTIVE TRUSTEES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, EMPLOYEES, AGENTS, ATTORNEYS, LEGAL REPRESENTATIVES, PROFESSIONALS, PARENTS, SUBSIDIARIES, EQUITY HOLDERS, MEMBERS, OFFICERS, DIRECTORS, MANAGERS AND ANY OTHER PERSON ACTING FOR OR ON BEHALF OF IT  OF AND FROM ANY AND ALL CLAIMS, LIABILITIES, DEMANDS, DAMAGES, ACTIONS, CAUSES OF ACTION, RIGHTS, COSTS, LOSSES, EXPENSES, ADVERSE CONSEQUENCES, DEBTS, DEFICIENCIES, DIMINUTION IN VALUE, LIENS, AMOUNTS PAID IN SETTLEMENT, DISBURSEMENTS, COMPENSATION AND SUITS AT LAW OR IN EQUITY, OF WHATSOEVER KIND OR NATURE, IN EACH CASE, THAT ANY OF

**THE RELEASING PARTIES EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE BECAUSE OF ANYTHING HERETOFORE DONE, OMITTED, SUFFERED, OR ALLOWED TO BE DONE BY ANY OF THE RELEASED PARTIES, WHETHER FORESEEN OR UNFORESEEN, FIXED OR CONTINGENT, DIRECT, INDIRECT OR DERIVATIVE, ASSERTED OR UNASSERTED, MATURED OR UNMATURED, LIQUIDATED OR UNLIQUIDATED, SUSPECTED OR UNSUSPECTED, OR WHETHER KNOWN OR UNKNOWN, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR BREACH OF CONTRACT OR ANY INTERFERENCE WITH CONTRACT, AND ANY DAMAGES AND THE CONSEQUENCES THEREOF RESULTING FOR ANY REASON WHATSOEVER, IN EACH CASE TO THE EXTENT ARISING PRIOR TO THE EFFECTIVE DATE IN CONNECTION WITH THE SENIOR LENDER CREDIT AGREEMENT, THE SECOND LIEN CREDIT AGREEMENT, THE EXISTING EQUITY INTERESTS, THE DIP CREDIT AGREEMENT, THE PLAN, OR THE CHAPTER 11 CASE (ALL OF THE FOREGOING, COLLECTIVELY, THE "RELEASED MATTERS").  NO RELEASING PARTY SHALL COMMENCE, AID OR PARTICIPATE IN (EXCEPT TO THE EXTENT REQUIRED BY ORDER OR LEGAL PROCESS ISSUED BY A COURT OR GOVERNMENTAL AGENCY OF COMPETENT JURISDICTION) ANY LEGAL ACTION OR OTHER PROCEEDING BASED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, UPON THE RELEASED MATTERS.   THIS RELEASE SHALL APPLY TO ALL UNKNOWN OR UNANTICIPATED RESULTS OF ANY ACTION OF ANY RELEASED PARTY OR THE DEBTOR WITH RESPECT OF THE RELEASED MATTERS, AS WELL AS THOSE KNOWN AND ANTICIPATED.**

**(B)    THE DEBTOR RELEASED PARTIES, FOR THEMSELVES, AND THEIR TRUSTEES, AFFILIATES, PREDECESSORS, SUCCESSORS, ASSIGNS, EMPLOYEES, AGENTS, ATTORNEYS, LEGAL REPRESENTATIVES, PROFESSIONALS, PARENTS, SUBSIDIARIES, EQUITY HOLDERS, MEMBERS, OFFICERS, DIRECTORS, MANAGERS AND ANY OTHER PERSON ACTING FOR OR ON BEHALF OF IT , RELEASES, ACQUITS AND FOREVER DISCHARGES EACH OF THE RELEASED PARTIES AND THE DEBTOR'S (IMMEDIATELY PRIOR TO THE RESTRUCTURING) REPRESENTATIVES, PROFESSIONALS, PARENTS, SUBSIDIARIES, EQUITY HOLDERS, MEMBERS, OFFICERS, DIRECTORS, MANAGERS AND ANY OTHER PERSON ACTING FOR OR ON BEHALF OF IT (COLLECTIVELY, THE "COMPANY REPRESENTATIVE RELEASED PARTIES" AND TOGETHER WITH THE RELEASED PARTIES, THE "COMPANY RELEASED PARTIES") OF AND FROM ANY AND ALL CLAIMS, LIABILITIES, DEMANDS, DAMAGES, ACTIONS, CAUSES OF ACTION, RIGHTS, COSTS, LOSSES, EXPENSES, ADVERSE CONSEQUENCES, DEBTS, DEFICIENCIES, DIMINUTION IN VALUE, LIENS, AMOUNTS PAID IN SETTLEMENT, DISBURSEMENTS, COMPENSATION AND SUITS AT LAW OR IN EQUITY, OF WHATSOEVER KIND OR NATURE, IN EACH CASE, THAT ANY OF THE DEBTOR RELEASED PARTIES EVER HAD, NOW HAS OR HEREAFTER CAN, SHALL OR MAY HAVE BECAUSE OF ANYTHING HERETOFORE DONE, OMITTED, SUFFERED, OR ALLOWED TO BE DONE BY ANY OF THE COMPANY RELEASED PARTIES, WHETHER FORESEEN OR UNFORESEEN, FIXED OR CONTINGENT, DIRECT, INDIRECT OR DERIVATIVE,**

**ASSERTED OR UNASSERTED, MATURED OR UNMATURED, LIQUIDATED OR UNLIQUIDATED, SUSPECTED OR UNSUSPECTED, OR WHETHER KNOWN OR UNKNOWN, INCLUDING, WITHOUT LIMITATION, ANY CLAIMS FOR BREACH OF CONTRACT OR ANY INTERFERENCE WITH CONTRACT, AND ANY DAMAGES AND THE CONSEQUENCES THEREOF RESULTING FOR ANY REASON WHATSOEVER, IN EACH CASE TO THE EXTENT ARISING PRIOR TO THE EFFECTIVE DATE IN CONNECTION WITH THE OPERATIONS AND MANAGEMENT OF THE DEBTOR AND EACH OF THE SENIOR LENDER CREDIT AGREEMENT, THE DIP CREDIT AGREEMENT, THE SECOND LIEN CREDIT AGREEMENT, AND THE EXISTING EQUITY INTERESTS, ALL OF THE FOREGOING, COLLECTIVELY, THE "COMPANY RELEASED MATTERS").  NO COMPANY RELEASING PARTY SHALL COMMENCE, AID OR PARTICIPATE IN (EXCEPT TO THE EXTENT REQUIRED BY ORDER OR LEGAL PROCESS ISSUED BY A COURT OR GOVERNMENTAL AGENCY OF COMPETENT JURISDICTION) ANY LEGAL ACTION OR OTHER PROCEEDING BASED IN WHOLE OR IN PART, DIRECTLY OR INDIRECTLY, UPON THE COMPANY RELEASED MATTERS.  THIS RELEASE SHALL APPLY TO ALL UNKNOWN OR UNANTICIPATED RESULTS OF ANY ACTION OF ANY COMPANY RELEASED PARTY TAKEN IN RESPECT OF THE COMPANY RELEASED MATTERS, AS WELL AS THOSE KNOWN AND ANTICIPATED.**

**IT IS THE DEBTOR'S POSITION THAT ENTRY OF THE CONFIRMATION ORDER WILL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE FOREGOING RELEASES, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, WILL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT SUCH RELEASE IS (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR AND THE OTHER RELEASED PARTIES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED IN THE PLAN; (II) IN THE BEST INTERESTS OF THE DEBTOR AND ALL HOLDERS OF CLAIMS; (III) FAIR, EQUITABLE, AND REASONABLE; (IV) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (V) A BAR TO ANY RELEASED CLAIM AGAINST THE DEBTOR AND THE RELEASED PARTIES AND THE COMPANY RELEASED PARTIES OR THEIR RESPECTIVE PROPERTY**

    **Section 10.08.**    **Exculpation and Limitation of Liability.**

TO THE EXTENT PERMITTED UNDER SECTION 1125(E) OF THE BANKRUPTCY CODE, NONE OF THE DEBTOR, THE REORGANIZED DEBTOR, THE DISBURSING AGENT, THE SENIOR LENDER, THE DIP LENDER, THE SECOND LIEN LENDER, THE CREDITORS' COMMITTEE, THE PLAN SPONSORS AND ANY OF THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES, MEMBERS, ATTORNEYS, CONSULTANTS, ADVISORS, AND AGENTS (BUT SOLELY IN THEIR CAPACITIES AS SUCH) SHALL HAVE OR INCUR ANY LIABILITY TO ANY HOLDER OF ANY CLAIM OR INTEREST FOR ANY ACT OR OMISSION UP TO AND INCLUDING THE EFFECTIVE DATE IN

CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE DEBTOR'S RESTRUCTURING AND THE CHAPTER 11 CASE, INCLUDING WITHOUT LIMITATION THE NEGOTIATION AND EXECUTION OF THE PLAN, THE CHAPTER 11 CASE, THE DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES FOR AND THE PURSUIT OF THE PLAN, THE CONSUMMATION OF THE PLAN, OR THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, INCLUDING, WITHOUT LIMITATION, ALL DOCUMENTS ANCILLARY THERETO, ALL DECISIONS, ACTIONS, INACTIONS AND ALLEGED NEGLIGENCE OR MISCONDUCT RELATING THERETO AND ALL PREPETITION ACTIVITIES LEADING TO THE PROMULGATION AND CONFIRMATION OF THE PLAN EXCEPT FRAUD, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER OF THE BANKRUPTCY COURT. ANY OF THE FOREGOING PARTIES SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES UNDER THE PLAN.

**Section 10.09.    Injunction Related to Releases and Exculpation.**

EXCEPT AS PROVIDED IN THE PLAN, THE CONFIRMATION ORDER SHALL PERMANENTLY ENJOIN THE COMMENCEMENT OR PROSECUTION BY ANY PERSON OR ENTITY, WHETHER DIRECTLY, DERIVATIVELY OR OTHERWISE, OF ANY CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED PURSUANT TO THE PLAN, INCLUDING BUT NOT LIMITED TO THE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION OR LIABILITIES RELEASED IN ARTICLE X OF THE PLAN.

**Section 10.10.    Administrative Expense Claims Incurred After the Confirmation Date.**

Administrative Expense Claims incurred by the Reorganized Debtor after the Confirmation Date, including (without limitation) Claims for Professionals' fees and expenses incurred after such date, may be paid by the Reorganized Debtor in the ordinary course of business and without the need for approval of the Bankruptcy Court.

**Section 10.11.    Term of Injunctions or Stays.**

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under Sections 105(a) or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date and thereupon shall be deemed to have expired or been superseded by the Injunctions set forth in the Plan.

# ARTICLE XI

# RETENTION OF JURISDICTION

## Section 11.01.    Exclusive Jurisdiction of Bankruptcy Court.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising out of, arising in or related to, the Chapter 11 Case, the Plan and the Confirmation Order to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated), including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance or priority of any Claim and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan and to hear and determine any other issue presented hereby or arising under the Plan, including during the pendency of any appeal relating to any Objection to such Claim;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses for Professionals authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

(c)    Hear and determine motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed on or commenced after the Effective Date, including proceedings with respect to the rights of the Estate to recover Property under sections 542 or 543 of the Bankruptcy Code;

(d)    Determine and resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or unexpired lease to which the Debtor is a party or with respect to which the Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(e)    Ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided therein and resolve any issues relating to Distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

(f)    Following the Effective Date and consistent with section 1142 of the Bankruptcy Code, construe, take any action and issue such orders as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases and other agreements or documents created in connection with the Plan and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Estate following consummation in accordance with sections 524 and 1141 of the Bankruptcy Code;

(g)    Determine and resolve any case, controversy, suit or dispute that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan or

59

(h)     Determine and resolve any case, controversy, suit or dispute that may arise relating to the GUC Administrator, the GUC Note, distributions to Class 4 General Unsecured Claims, or implementation of the provisions of the Plan relating to Class 4 General Unsecured Claims;

(i)     Modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code and the Plan or modify the Plan Summary, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Summary or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Plan Summary, the Confirmation Order;

(j)     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(k)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(l)     Determine any other matters that may arise in connection with or relating to the Plan, the Plan Summary, the Confirmation Order and the Bankruptcy Code;

(m)     Determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     Continue to enforce the automatic stay through the Effective Date;

(o)     Hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan, and issues presented or arising under the Plan, including but not limited to disputes among Holders or with the Reorganized Debtor and arising under agreements, documents or instruments executed in connection with or governed by the Plan;

(p)     Hear and determine any other matter relating to the Plan, its interpretation or enforcement; and

(q)     Enter a final decree and close the Chapter 11 Case.

**Section 11.02.     Non-Exclusive Jurisdiction of Bankruptcy Court.**

Following the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction of the Chapter 11 Case to the fullest extent permitted by applicable law, including, without limitation, jurisdiction to:

60

(a)      Recover all Property of the Estate, wherever located;

(b)      Hear and determine any motions or contested matters involving Taxes, Tax refunds, Tax attributes and Tax benefits and similar or related matters with respect to any of the Debtor, arising prior to the Confirmation Date or relating to the period of administration of the Chapter 11 Case, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code; and

(c)      Hear any other matter not inconsistent with the Bankruptcy Code.

**Section 11.03.      Failure of Bankruptcy Court to Exercise Jurisdiction.**

If the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction over any matter arising under, arising in or related to the Debtor or the Chapter 11 Case, this Article shall not prohibit or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such subject matter.

## ARTICLE XII

## CONFIRMATION AND EFFECTIVENESS OF THE PLAN

**Section 12.01.      Conditions Precedent to Confirmation, Generally.**

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Plan, the Debtor believes that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtor has complied or will comply with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

**Section 12.02.    Conditions Precedent to Confirmation.**

Confirmation of the Plan is subject to:

(a)    the Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

2088236-1

(b)      entry of the Confirmation Order in form and substance reasonably satisfactory to the Debtor, the Creditors' Committee and the Plan Sponsors shall be in full force and effect; and

(c)      the Plan and related documents having been filed in substantially final form prior to the Confirmation Hearing.

### Section 12.03.      Statutory Confirmation Requirements

Set forth below is a summary of the relevant statutory confirmation requirements.

### 1.      Best Interest Test

Each Holder of a Claim or Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Holder of a Claim or Interest equals or exceeds the value that would be allocated to such Holders in a liquidation under chapter 7 of the Bankruptcy Code (the "Best Interest Test").  The Debtor believe the Holders of Claims against and Interests in the Debtor will have an equal or greater recovery as a result of an orderly chapter 11 reorganization as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons:

To determine the value that a Holder of a Claim or Interest in an Impaired Class would receive if the Debtor was liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtor's Property if the Debtor's Chapter 11 Case had been converted to a chapter 7 liquidation case and the Debtor's Property were liquidated by a chapter 7 trustee (the "Liquidation Value").  The Liquidation Value would consist of the net proceeds from the disposition of the Debtor's Property, augmented by Cash held by the Debtor and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

As explained below, the Liquidation Value available for satisfaction of Claims and Interests in the Debtor would be reduced by: (a) the costs, fees and expenses of the liquidation under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee, and (c) certain other costs arising from conversion of the Chapter 11 Case to chapter 7.

The Debtor believes that Holders of Allowed General Unsecured Claims have benefited and will continue to clearly benefit from the reorganization of the Debtor under the terms of the Plan.  If the Debtor's Property were liquidated by a chapter 7 trustee, the Debtor projects that the maximum recovery for Holders of Allowed General Unsecured Claims would be zero.  Under the Plan, the Debtor projects a recovery of 5 to 7 percent.

Moreover, under the Plan the Debtor will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals.  The Cash to be distributed to Creditors would be reduced by the chapter 7

trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee.  Bankruptcy Code § 326(a) permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[3]  The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims and Interests against the Debtor.  Moreover, these chapter 7 trustee fees would reduce the funds available for distribution to the Debtor's Creditors from additional recoveries such as preferential payments, expunged Administrative Expense Claims and the proceeds of successful Estate litigation or settlement.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to Creditors.  Bankruptcy Rule 3002(c) provides that conversion of a chapter 11 case to chapter 7 will trigger a new bar date for filing claims against the Debtor, and that the new bar date will be 90 days after the first date set for the meeting of creditors called under section 341 of the Bankruptcy Code.  Not only would a chapter 7 liquidation delay distribution to Creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Case, or were late-filed, could be filed against the Debtor.  Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the Estate.

For the reasons set forth above, the Debtor believes that the Plan provides a superior recovery for Holders of Claims and Interests, and the Plan meets the requirements of the Best Interest Test.

## 2.    Financial Feasibility Test

Even if the Plan is accepted by each Class of Claims and Interests voting on the Plan, and even if the Bankruptcy Court determines that the Plan satisfies the Best Interest Test, the Bankruptcy Code requires that, in order for the Plan to be confirmed by the Bankruptcy Court, it must be demonstrated that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

As part of this analysis, the Debtor has prepared projections of the financial performance of the Reorganized Debtor for each of the three calendar years from 2011 through 2015 (the "Financial Projections").  The Financial Projections, and the assumptions on which they are based, are set forth in Exhibit B hereto, and discussed in Article XIV of the Disclosure Statement.

The Debtor believes that it will be able to make all payments required pursuant to the Plan while conducting ongoing business operations and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

---

[3] Bankruptcy Code § 326(a) permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

### 3.    Acceptance by Impaired Classes

Bankruptcy Code § 1129(b) provides that a plan can be confirmed even if it has not been accepted by all impaired classes as long as at least one impaired class of claims has accepted it. The process by which nonaccepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown."  The Bankruptcy Court may confirm the Plan at the request of the Debtor notwithstanding the Plan's rejection (or deemed rejection) by impaired classes as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted it.  A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to classes of equal rank.

A class of claims under a plan accepts the plan if the plan is accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims in the class that actually vote on the plan.  A class of interests accepts the plan if the plan is accepted by holders of interests that hold at least two-thirds in amount of the allowed interests in the class that actually vote on a plan.

A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan.  Solicitation of acceptances from such a class is not required.  A class is "impaired" unless (i) the legal, equitable and contractual rights to which a claim or interest in the class entitles the holder are not modified, or (ii) the effect of any default is cured and the original terms of the obligation are reinstated.

A plan is fair and equitable as to a class of secured claims that rejects the plan if the plan provides (i)(a) that the holders of claims included in the rejecting class retain the liens securing those claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and (b) that each holder of a claim of such class receives on account of that claim deferred cash payments totaling at least the allowed amount of that claim, of a value, as of the effective date of the plan, at least equal to the value of the holder's interest in the estate's interest in such property; (ii) for the sale, subject to Bankruptcy Code § 363(k), of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of the liens, with the liens to attach to the proceeds of the sale, and the treatment of the liens on proceeds under clause (i) or (ii) of this paragraph; or (iii) for the realization of the indubitable equivalent of such claims.

A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (ii) that the holder of any claim or interest that is junior to the claims of such rejecting class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (i) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greater of the allowed amount of any fixed liquidation preference to which such holder is

entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) that the holder of any interest that is junior to the interest of such rejecting class will not receive or retain under the plan on account of such junior interest any property at all.  The Debtor believe the Plan to be both fair and equitable.

### Section 12.04.    Conditions Precedent to the Effective Date.

The occurrence of the Effective Date is subject to:

(a)    the Confirmation Order, in form and substance reasonably satisfactory to the Debtor, the Plan Sponsors and the Creditors' Committee shall be in full force and effect;

(b)    the Plan and related documents, including the Amended Operating Agreement, in form and substance reasonably satisfactory to the Debtor and the Plan Sponsors (and, with respect to the Plan and all matters relating to the GUC Note, the Creditors' Committee), being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtor that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith;

(c)    repayment of the DIP Claims and repayment of all Obligations under the DIP Agreement;

(d)    all other actions and documents necessary to implement the Plan shall have been effected or executed and shall be reasonably acceptable to the Debtor, the Plan Sponsors and the Creditors' Committee;

(e)    the New Equity Units shall have been authorized in the amounts set forth in the Plan and on terms reasonably satisfactory to the Debtor, the Plan Sponsors and the Creditors' Committee;

(f)    all material governmental, regulatory and third party approvals, waivers and/or consents in connection with the Plan, if any, having been obtained and remaining in full force and effect, and there existing no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the consummation of the Plan; and

(g)    entry into the Exit Facility Agreement.

### Section 12.05.    Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.

The Debtor, subject to receipt of consent from the Plan Sponsors, the Creditors' Committee, (and, to the extent their Claims have not been fully satisfied, the Senior Lender and the DIP Lender), which consent shall not be unreasonably withheld, and to the extent not prohibited by applicable law, shall have the right to waive one or more of the conditions precedent set forth above at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with confirmation of the Plan.

66

**Section 12.06.        Effect of Failure of Conditions.**

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 60 days after the Confirmation Date, or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, then the Debtor may file a motion to vacate the Confirmation Order before all of the conditions have been satisfied or duly waived.  If the Confirmation Order is vacated pursuant to this Section, the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtor; (b) prejudice in any manner the rights of the holder of any Claim against or Interest in the Debtor; or (c) constitute an admission, acknowledgment, offer or undertaking by any Debtor or any other entity with respect to any matter set forth in the Plan.

## ARTICLE XIII

## FINANCIAL INFORMATION

**Section 13.01.        Feasibility; Financial Projections**

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan.  As part of this analysis, the Debtor has prepared projections of the financial performance of the Reorganized Debtor for each of the calendar years from 2013 through 201[  ] (the "Financial Projections", attached hereto as Exhibit B).

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur in August, 2013.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN.  WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, WERE REASONABLE WHEN PREPARED IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED.  THE DEBTOR MAKES NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtor prepared these Financial Projections based upon certain assumptions that it believes to be reasonable under the circumstances.  Those assumptions considered to be significant are described therein.  The Financial Projections have not been examined or compiled by independent accountants.  The Debtor makes no representation as to the accuracy of the projections or its ability to achieve the projected results.  Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management, and are subject to significant incremental uncertainty as a result of the scope and potential duration of the current economic recession underway both in the United States and abroad.  Inevitably, some

assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results.  Therefore, the actual results achieved throughout the period of the Financial Projections may vary from the projected results and the variations may be material.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

### Section 13.02.    Valuation of the Debtor.

THE VALUATION INFORMATION SET FORTH IN THIS SECTION REPRESENTS A HYPOTHETICAL VALUATION OF THE REORGANIZED DEBTOR, WHICH ASSUMES THAT SUCH REORGANIZED DEBTOR CONTINUES AS AN OPERATING BUSINESS.  THE ESTIMATED VALUE SET FORTH IN THIS SECTION DOES NOT PURPORT TO CONSTITUTE AN APPRAISAL OR NECESSARILY REFLECT THE ACTUAL MARKET VALUE THAT MIGHT BE REALIZED THROUGH A SALE OR LIQUIDATION OF THE REORGANIZED DEBTOR, ITS SECURITIES OR ITS ASSETS, WHICH VALUE MAY BE SIGNIFICANTLY HIGHER OR LOWER THAN THE ESTIMATE SET FORTH IN THIS SECTION.

### 1.    Overview.

The Debtor has estimated the going concern value of the enterprise under the discounted cash flow method.  The Debtor undertook this analysis to determine the value available for distribution to Holders of Allowed Claims pursuant to the Plan and to analyze the relative recoveries to such Holders thereunder.  The valuation was prepared as of [    ], and is based on historical financial information from the years [    ], and the Financial Projections provided by the Debtor's management for the years [    ] through [    ].

For the purpose of this valuation, the Debtor assumed no material changes that would affect the value.  Based on the Financial Projections and solely for purposes of the valuation, the Debtor estimates that the estimated value on a going concern basis (the "Enterprise Value") of the Reorganized Debtor before the deduction of any debt is approximately $[    ] million.  The estimate of Enterprise Value does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

**THE ASSUMED ENTERPRISE VALUE REFLECTS WORK PERFORMED BY THE DEBTOR USING FORWARD LOOKING ESTIMATES.  ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT THE DEBTOR'S CONCLUSIONS, THE DEBTOR DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM THE VALUATION.**

The Financial Projections were reasonably prepared in good faith and on a basis reflecting the Debtor's most accurate currently available estimates and judgments as to the future operating and financial performance of the Reorganized Debtor.  If the business performs at levels below those set forth in the Financial Projections, such performance may have a materially negative impact on Enterprise Value.

In estimating the Enterprise Value, the Debtor: (a) reviewed certain historical financial information for recent years and interim periods; (b) reviewed certain internal financial and operating data; (c) discussed operations and future prospects with its senior management team; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that were deemed generally comparable to the operating business of the Reorganized Debtor.

In addition, no other independent valuations or appraisals of the Debtor were obtained in connection herewith. Such estimates were developed solely for purposes of the formulation and negotiation of the Plan and the analysis of implied relative recoveries to Holders of Allowed Claims thereunder.

The estimated Enterprise Value of the Reorganized Debtor does not constitute a recommendation to any Holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. The Debtor does not express any view as to what the trading value of the Reorganized Debtor or securities would be on issuance or at any other time. The estimated Enterprise Value of the Reorganized Debtor set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and

The Debtor's estimate of Enterprise Value reflects the application of standard valuation techniques and does not purport to reflect or constitute appraisals, liquidation values or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. The value of an operating business is subject to numerous uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such a business. As a result, the estimated Enterprise Value of the Reorganized Debtor set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Neither the Reorganized Debtor nor any other person assumes responsibility for any differences between the Enterprise Value and such actual outcomes. Actual value or market prices will depend upon, among other things, the operating performance of the Reorganized Debtor, prevailing interest rates, conditions in the financial markets, developments in the Reorganized Debtor' industry and economic conditions generally, and other factors which generally influence market value or prices of securities.

### 2.      Valuation Methodology

The following is a brief summary of the financial analyses performed to arrive at the estimated Enterprise Values for the Reorganized Debtor. In performing the financial analyses described below and certain other relevant procedures, the Debtor reviewed all significant assumptions. The valuation analysis relies solely on the discounted cash flow analysis ("DCF").

### a.      Discounted Cash Flow Analysis

The DCF, attached hereto as Exhibit C, is a forward-looking enterprise valuation methodology that estimates the value of an asset or business by calculating the present value of expected future cash flows to be generated by that asset or business. Our model forecasts the

cash flows to invested capital that a prospective buyer would anticipate receiving through continued operations over a five year period. These invested capital cash flows are discounted to their present value and are then added to the residual or terminal value of the fifth year projected invested capital cash flow. The terminal value of the fifth year is calculated by capitalizing the invested capital cash flow in the sixth year and discounting that value to present value using the weighted average cost of capital (the "Discount Rate"). The Discount Rate reflects the estimated blended rate of return that would be required by debt and equity investors to invest in the business. The terminal value was derived by applying a long term growth rate to the final projected year of the projection period and then applying a multiple to the Reorganized Debtor's projected earnings before interest, taxes, depreciation and amortization ("EBITDA"), discounted by the Discount Rate.

To estimate the Discount Rate, the Debtor used the cost of equity and the after-tax cost of debt for the Reorganized Debtor as calculated in Exhibit C. In determining the terminal multiple, the Debtor analyzed the median EBITDA multiples of certain guideline companies.

Although formulaic methods are used to derive the key estimates for the DCF methodology, their application and interpretation involve complex considerations and judgments concerning potential variances in the projected financial and operating characteristics of the Reorganized Debtor, which in turn affect its cost of capital and terminal multiples. The Debtor calculated its DCF valuation on the Discount Rates and terminal value EBITDA multiples as indicated below.

<u>DISCOUNTED CASH FLOW ASSUMPTIONS</u>

[___]

In applying the above methodology, the detailed Financial Projections for the period beginning [   ] were used to derive unlevered after-tax free cash flows. Free cash flows include sources and uses of cash not reflected in the income statement, such as changes in working capital and capital expenditures. For purposes of the DCF, the Reorganized Debtor is assumed to be a full taxpayer at the applicable regional corporate income tax rates (the effective tax rate is assumed to be 40%). These cash flows, along with the terminal value, are discounted back to the assumed Effective Date using the range of Discount Rates described above to arrive at a range of Enterprise Values.

**b.    <u>Best Interests Test</u>**

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each Holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code. To determine what Holders of Claims in each Impaired Class would receive if the Debtor were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtor's assets and properties in the context of liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the

disposition of assets and properties of the Debtor, augmented by the Cash held by the Debtor at the time of the commencement of the liquidation case. Such Cash amount would be (i) first, reduced by the amount of the Allowed secured lender Claims, if any, (ii) second, reduced by the total amount of post-petition accounts payable and accrued expenses less all non-claims, (iii) third, reduced by the amount of any other priority Claims, (iv) fourth, reduced by the costs and expenses of liquidation and any such additional Administrative Expense Claims that might result from the termination of the Debtor's business and the use of chapter 7 for the purposes of liquidation, and (v) fifth, reduced by the Debtor's costs of liquidation under chapter 7, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other Professionals that such a trustee might engage. In addition, Claims would arise by reason of the breach or rejection of obligations incurred and leases and Executory Contracts assumed or entered into by the Debtor prior to the filing of the chapter 7 case.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtor's assets and Property, after subtracting the amounts attributable to the foregoing claims, must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Debtor's Chapter 11 Case, the Debtor has determined that confirmation of the Plan will provide each Holder of an Allowed Claim with a recovery that is not less than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7.

The Debtor has prepared a liquidation analysis which is annexed hereto as Exhibit D (the "Liquidation Analysis"). The information set forth in Exhibit D provides (a) a summary of the liquidation values of the Debtor's assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtor's estate, and (b) the expected recoveries of the Debtor's creditors under the Plan. The Liquidation Analysis indicates that Holders of General Unsecured Claims would, after payment of liquidation costs and expenses, receive a recovery of 0% on their Claims in a liquidation scenario. However, Holders of General Unsecured Claims are receiving a recovery of approximately 5-7% under the Plan. Thus, Holders of General Unsecured Claims would not receive a higher recovery in a liquidation.

The Liquidation Analysis is based upon a number of estimates and assumptions that, although developed and considered reasonable by the Debtor's management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtor and its management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtor. Accordingly, the values reflected might not be realized if the Debtor was, in fact, to be liquidated. The chapter 7 liquidation period is assumed to last several months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the

71

assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

## ARTICLE XIV

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan.  This discussion is only for general information purposes and only describes the expected tax consequences to Holders entitled to vote on the Plan.  It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws.  This discussion is based on the Internal Revenue Code of 1986, as amended, Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the IRS, all as in effect on the date of the Disclosure Statement.  These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below.  No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below.  There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

This discussion does not address all federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign Estate, Holders who are not citizens or residents of the U.S., Holders subject to the alternative minimum tax, and Holders who have a functional currency other than the U.S. dollar.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

**TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (a) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (b) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (c) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

72

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the applicable withholding rate unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor. The Debtor may be required to withhold the applicable percentage of any payments made to a Holder who does not provide his, her or its taxpayer identification number. Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.  NEITHER THE DEBTOR NOR ITS PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

1.      **Federal Income Tax Consequences to Holders of Second Lien Claims**

In accordance with the Plan, each Holder of an Allowed Second Lien Claim against the Debtors shall be entitled to receive his, her or its Pro Rata Share of the Second Lien Claim Distribution. Each Holder of an Allowed General Unsecured Claim may recognize gain or loss upon receipt of such Pro Rata Share equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim. The amount realized is equal to the value of such Creditor's Pro Rata Share of the proceeds of the Debtors' Property. Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Second Lien Lender. If a Claim is a capital asset and it has been held for more than one year, such Second Lien Lender will realize long-term capital gain or loss.

The federal income tax consequences to such Creditors will differ and will depend on factors specific to each such Second Lien Lender, including, but not limited to:  (i) whether the Second Lien Lender's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Second Lien Lender's Claim, (iii) the type of consideration received by the Creditor in exchange for the Claim, (iv) whether the Second Lien Lender is a United States person or a foreign person for United States federal income tax purposes, (v) whether the Second Lien Lender reports income on the accrual or cash basis method, and (vi) whether the Second Lien Lender has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

2.      **Federal Income Tax Consequences to Holders of General Unsecured Claims**

In accordance with the Plan, each Holder of an Allowed General Unsecured Claim against the Debtors shall be entitled to receive his, her or its Pro Rata Share of the General Unsecured Claim Distribution.  Each Holder of an Allowed General Unsecured Claim will

recognize gain or loss upon receipt of such Pro Rata Share equal to the difference between the "amount realized" by such Creditor and such Creditor's adjusted tax basis in his, her or its Claim.  The amount realized is equal to the value of such Creditor's Pro Rata Share of the proceeds of the Debtors' Property.  Any gain or loss realized by an Unsecured Creditor should constitute ordinary income or loss to such creditor unless such Claim is a capital asset in the hands of such Unsecured Creditor.  If a Claim is a capital asset and it has been held for more than one year, such Creditor will realize long-term capital gain or loss.

The federal income tax consequences to such Creditors will differ and will depend on factors specific to each such Creditor, including, but not limited to:  (i) whether the Creditor's Claim (or a portion thereof) constitutes a Claim for principal or interest, (ii) the origin of the Creditor's Claim, (iii) the type of consideration received by the Creditor in exchange for the Claim, (iv) whether the Creditor is a United States person or a foreign person for United States federal income tax purposes, (v) whether the Creditor reports income on the accrual or cash basis method, and (vi) whether the Creditor has taken a bad debt deduction or otherwise recognized a loss with respect to the Claim.

### 3.    Withholding and Reporting

Payments of interest, dividends and certain other payments are generally subject to backup withholding at the rate at the applicable withholding rate unless the payee of such payment furnishes such payee's correct taxpayer identification number (social security number or employer identification number) to the payor.  The Debtor may be required to withhold the applicable percentage of any payments made to a Holder who does not provide his, her or its taxpayer identification number.  Backup withholding is not an additional tax, but an advance payment that may be refunded to the taxpayer by the IRS to the extent that the backup withholding results in an overpayment of tax by such taxpayer in such taxable year.

**THERE ARE MANY FACTORS THAT WILL DETERMINE THE TAX CONSEQUENCES TO EACH SUCH CREDITOR.  FURTHERMORE, THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND IN SOME CASES UNCERTAIN.  THEREFORE, IT IS IMPORTANT THAT EACH CREDITOR OBTAIN HIS, HER OR ITS OWN PROFESSIONAL TAX ADVICE REGARDING THE TAX CONSEQUENCES TO SUCH CREDITOR AS A RESULT OF THE PLAN**

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN.  NEITHER THE DEBTOR NOR ITS PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

**Section 14.02.       Consequences to the Debtor.**

Subject to certain exceptions, a debtor recognizes cancellation of debt ("COD") income upon satisfaction of its outstanding indebtedness equal to the excess of (i) the amount of the indebtedness discharged, over (ii) the issue price of any new indebtedness issued, the amount of cash paid, and the fair market value of any other consideration (including stock of the debtor) given in satisfaction of the indebtedness.  As discussed below, there is an insolvency exception to the recognition of COD income which will apply to the Reorganized Debtor in connection with the Plan.

The Reorganized Debtor will not be required to include COD income to the extent Reorganized Debtor is insolvent at the time of the discharge.  IRC § §108(a)(1)(B) and 108(a)(3).

However, under IRC § 108(b)(2), the Reorganized Debtor must reduce certain tax attributes (in general, first its Net Operating Loss carryovers and then certain tax credits, capital loss carryovers, the tax basis of its assets, and foreign tax credits) by the amount of COD income excluded from gross income by this exception.

## ARTICLE XV

## SECURITIES LAW MATTERS

**Section 15.01.       General.**

The Plan provides for the issuance of the New Equity Units by the Reorganized Debtor. The Debtor believes that the New Equity Units are "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws.

**Section 15.02.       New Equity Units.**

**1.       Issuance of the New Equity Units**

The Debtor believes that the offer and sale of the New Equity Units pursuant to the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon the exemptions set forth in Section 1145 of the Bankruptcy Code or, if applicable, in reliance on the exemption from registration set forth in Section 4(2) of the Securities Act or Regulation D promulgated under the Securities Act by the SEC.

Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against, the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.  In reliance upon section 1145 of the Bankruptcy Code, the Securities Act and similar federal, state or local law, the New Equity Units will not be registered under the Securities Act or any state securities laws.

The Debtor believes that the offer and sale of any securities to be issued in conjunction with the Plan to which the exemption provided under Section 1145 of the Bankruptcy Code is not applicable will be exempt from registration pursuant to the nonpublic offering exemption under Section 4(2) of the Securities Act or Regulation D promulgated under the Securities Act by the SEC or equivalent exemptions under state securities laws.

### 2.    Resale of the New Equity Units: Securities Law Restrictions.

#### a.    Section 1145 of the Bankruptcy Code

The Debtor further believes that subsequent transfers of the New Equity Units by the Holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and Section 1145(b)(1) of the Bankruptcy Code, may be exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and applicable state securities laws if certain conditions are met.  In addition, the New Equity Units generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the New Equity Units are advised to consult with their own legal advisors as to the availability of any such exemptions from registration under federal or state law in any given instance and as to any applicable requirements or conditions to such availability.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act.  In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities.  The reference to "issuer," as used in the definition of "underwriter contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant

76

percentage of the reorganized debtor's or its successor's voting securities.  Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resale of the New Equity Units by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law.  Under certain circumstances, holders of the New Equity Units who are deemed to be "underwriters" may be entitled to resell their New Equity Units pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.  Generally, Rule 144 of the Securities Act would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met.  However, the Reorganized Debtor does not presently intend to make publicly available the requisite information regarding the Reorganized Debtor and, as a result, Rule 144 will not be available for resales of the New Equity Units by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the New Equity Units would depend upon various facts and circumstances applicable to that Person.  Accordingly, the Debtor expresses no view as to whether any Person would be deemed an "underwriter" with respect to the New Equity Units.  In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtor makes no representations concerning the right of any Person to freely resell the New Equity Units.

        b.      Section 4(2) of the Securities Act

If the Bankruptcy Court does not find that Section 1145 of the Bankruptcy Code is applicable to the issuance of any such securities under the Plan, the Debtor believes that any such issuance of such securities would be exempt pursuant to Section 4(2) of the Securities Act , or Regulation D promulgated under the Securities Act by the SEC as a transaction by an issuer not involving any public offering, and equivalent exemptions in state securities laws.

Securities issued pursuant to the exemption provided by Section 4(2) of the Securities Act or Regulation D promulgated under the Securities Act by the SEC are considered "restricted securities."  As a result, resales of such securities may not be exempt from the registration requirements of the Securities Act or other applicable law.

Securities offered and sold pursuant to Section 4(2) of the Securities Act may be publicly resold if and when they are registered under the Securities Act (and under any state securities law that require registration) or if an exemption from registration is available to the holder of such securities, such as pursuant to the resale provisions of Rule 144 under the Securities Act, and such holder demonstrates the availability of such exemption to the reasonable satisfaction of the issuer of those securities.

**THE DEBTOR STRONGLY RECOMMENDS THAT POTENTIAL RECIPIENTS OF THE NEW EQUITY UNITS CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES WITHOUT COMPLIANCE WITH THE FEDERAL AND STATE SECURITIES LAWS.**

## ARTICLE XVI

## SUMMARY OF VOTING PROCEDURES

The Disclosure Statement, including all Exhibits hereto and the related materials included herewith, is being furnished to the Holders of Claims in Classes 3, and 4, which are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the ballot (the "Ballot") enclosed with the Disclosure Statement.  No other votes will be counted.  Consistent with the provisions of Bankruptcy Rule 3018, the Debtor have fixed [   ]  at 4:00 p.m. (prevailing Eastern Time) as the Voting Record Date.  Ballots must be RECEIVED by counsel for the Debtor at the address set forth below (or as otherwise directed) no later than 4:00 p.m. (prevailing Eastern Time) on [   ], unless the Debtor, at any time, subject to the consent of the Plan Sponsors, extends such date by oral or written notice, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (prevailing Eastern Time) on such extended date.

If the Ballot is damaged or lost, you may contact counsel for the Debtor at the number set forth below.

Ballots received by facsimile, telecopy or other means of electronic transmission will not be accepted, except as otherwise agreed by the Debtor with the consent of the Plan Sponsors.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot.  A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to counsel for the Debtor.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to counsel for the Debtor.  To be effective, notice of revocation or withdrawal must: (a) be received on or before the Voting Deadline by counsel for the Debtor at its address specified below; (b) specify the name of the Holder of the Claim whose vote on the Plan is being withdrawn or revoked; (c) contain the description of the Claim as to which a vote on the Plan is withdrawn or revoked; and (d) be signed by the Holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot.  The foregoing procedures should also be followed with respect to a person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

If you have any questions concerning voting procedures, you may contact Epiq by email at tabulation@epiqsystems.com or by telephone at 646-282-2500.

## ARTICLE XVII

## CERTAIN FACTORS TO BE CONSIDERED REGARDING THE PLAN

Holders of Claims and Interests against the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in the Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

**Section 17.01.     Certain Bankruptcy Considerations.**

**1.     General.**

Although the Plan is designed to minimize the length of time remaining in the Chapter 11 Case, it is impossible to predict with certainty the amount of time that the Debtor may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

Even if the Plan is confirmed on a timely basis, the Chapter 11 Case could have an adverse effect on the Debtor's business. Among other things, it is possible that any delays could adversely affect the Debtor's relationships with its key vendors and suppliers, customers and employees. If the Debtor is unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, the Debtor may be forced to continue the Chapter 11 Case for an extended period while the Debtor tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

**2.     Failure to Receive Requisite Acceptances.**

Classes 3 and 4 are the only Classes that are entitled to vote to accept or reject the Plan. If the requisite acceptances are not received by at least one Impaired Class, the Debtor will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code, because at least one Impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. Further, if the requisite acceptances are not received, the Debtor may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization for the Debtor, or otherwise, the Debtor may be required to liquidate the Estate under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtor's Creditors as those proposed in the Plan.

**3.     Failure to Confirm the Plan.**

Even if the requisite acceptances are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may decide not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will

not be followed by liquidation or the need for further financial reorganization of the Debtor, and that the value of distributions to dissenting Holders of Claims and Interests may not be less than the value such Holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtor believes that the Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the contemplated solicitation must comply with the requirements of section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period and the adequacy of the information contained in the Disclosure Statement.

### 4.      Failure to Consummate the Plan.

One condition to consummation of the Plan is the entry of the Confirmation Order that will approve, among other things, the assumption of a substantial number of the majority of the Debtor's Executory Contracts and unexpired leases.  As of the date of the Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

### 5.      Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtor believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### Section 17.02.      Risks Relating to the GUC Note and Contingent Note Issued to Holders of AllowedGeneral Unsecured Claims

### 1.      Ability to Service Debt.

The GUC Note is payable by the Reorganized Debtor over a 3 year time period after the Effective Date.  The contingent note is only payable if the Reorganized Debtor sells its business in an amount greater than $30 million within 3 years following the Effective Date.  Although the Reorganized Debtor will have less indebtedness than the Debtor, the Reorganized Debtor will still have significant obligations to service its customers.  The Reorganized Debtor's ability to make payments on and to refinance its debt, and the Reorganized Debtor's other obligations, will depend on its future financial and operating performance and its ability to generate Cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtor.

There can be no assurance that the Reorganized Debtor will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtor's debt obligations under the GUC Note.  Moreover, the Reorganized Debtor is not obligated to sell its business.  In any event, there can be no assurances that the

80

contingencies under the contingent note will come to fruition.  Thus, there can be no assurances that any amounts would ever come due under the contingent note.

.

### Section 17.03.    Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtor currently does not intend to seek any ruling from the IRS on the tax consequences of the Plan.  Even if the Debtor decides to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date.  In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request.  *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtor has taken, or intends to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.*

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtor believes it will be subject to the fresh-start accounting rules.  Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued.  This process is guided by purchase price allocation standards under GAAP.

In addition, the contents of the Disclosure Statement should **not** be construed as legal, business or tax advice.  Each Holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Interest.

The Disclosure Statement is **not** legal advice to you.  The Disclosure Statement may **not** be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### Section 17.04.    Risks Associated with the Business.

#### 1.    The Debtor's Chapter 11 Case May Negatively Impact the Debtor's Future Operations.

While the Debtor believes it will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtor's emergence from chapter 11.

#### 2.    The Debtor Rely on a Limited Number of Key Suppliers and Vendors to Operate its Business.

Currently, the shipments of the Debtor's suppliers are adequate to supply the Debtor's needs.  However, if the Debtor experience future problems with the suppliers, the Debtor could become unable to operate its business successfully.

81

2088236-1

3.       **The Loss of One or More of the Debtor's Key Personnel Could Disrupt Operations and Adversely Affect Financial Results.**

The Debtor is highly dependent upon the availability and performance of their senior management.  Accordingly, the loss of services of any of the Debtor's senior management could materially adversely affect the Debtor's business, financial condition and operating results.

4.       **Legal Matters.**

The Debtor is party to routine litigation incidental to business.  It is not anticipated that any current or pending lawsuit, either individually or in the aggregate, is likely to have a material adverse effect on the Debtor's financial condition.  However, no assurances can be provided that the Debtor will be able to successfully defend or settle all pending or future purported claims, and the Debtor's failure to do so may have a material adverse effect on the Reorganized Debtor.

## ARTICLE XVIII

## MISCELLANEOUS PROVISIONS

**Section 18.01.       Binding Effect of Plan.**

The provisions of the Plan shall be binding upon and inure to the benefit of the Debtor, any Holder of any Claim or Interest treated herein and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

**Section 18.02.       Severability.**

Should the Bankruptcy Court determine prior to entry of the Confirmation Order, that any provision of the Plan is either illegal or unenforceable on its face or illegal or unenforceable as applied to any Claim or Interest, such provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which the provision is illegal.  Unless otherwise determined by the Bankruptcy Court, such a determination shall in no way limit or affect the enforceability and operative effect of any other provisions of the Plan.  The Debtor reserves the right not to proceed with Confirmation and/or consummation of the Plan if any such ruling occurs.

**Section 18.03.       Governing Law.**

Except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to conflicts of law principles which would apply the law of a jurisdiction other than the state of Delaware or the United States of America.

### Section 18.04.    Amendments.

#### 1.    Plan Modifications.

The Plan may be amended, modified, or supplemented by the Debtor, with the consent of the Plan Sponsors and the Creditors' Committee (and, to the extent their Claims have not been fully satisfied, the Senior Lender and the DIP Lender) in the manner provided for by section 1127 of the Bankruptcy Code, or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court.  In addition, after the Confirmation Date and upon consultation with the Creditors' Committee or the General Unsecured Claims Administrator as applicable, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtor may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

#### 2.    Other Amendments.

Prior to the Effective Date, the Debtor may make appropriate technical adjustments and modifications to the Plan, with the consent of the Plan Sponsors and the Creditors' Committee, (and, to the extent their Claims have not been fully satisfied, the Senior Lender and the DIP Lender) without further order or approval of the Bankruptcy Court; provided, however, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

### Section 18.05.    Revocation or Withdrawal of the Plan.

The Debtor reserves the right to revoke or withdraw the Plan prior to the Effective Date, with the consent of the Plan Sponsors and the Creditors' Committee.  If the Debtor takes such action, the Plan shall be deemed null and void.

### Section 18.06.    Confirmation Order.

The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtor during the period commencing on the Commencement Date and ending on the Confirmation Date, except for any acts constituting willful misconduct or fraud.

### Section 18.07.    Section 1125(e) of the Bankruptcy Code.

The Debtor has, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtor (and its affiliates, agents, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and therefore, to the extent permitted by Section 1125(e) of the Bankruptcy Code, are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the

83

solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

**Section 18.08.    Notices.**

Any notice required or permitted to be provided under the Plan shall be in writing and served by either prepaid (i) certified mail, return receipt requested, (ii) hand delivery, or (iii) overnight delivery service, to be addressed as follows:

If to the Debtor or Reorganized Debtor:

Olshan Frome Wolosky LLP
Counsel for Namco, LLC
Park Avenue Tower
65 East 55th Street
New York, NY  10022
Attn:   Michael Fox, Esq.
          Jordanna Nadritch, Esq.


A M Saccullo Legal, LLC
Co-Counsel for Namco, LLC
27 Crimson King Drive
Bear, DE 19701
Attn: Anthony M. Saccullo, Esq.


With a copy to:

Namco, LLC
100 Sanrico Drive
Manchester, CT 06042
Attention:      Mark Scott

**Section 18.09.    Filing of Additional Documents.**

On or before substantial consummation of the Plan, or such later time as may be authorized by the Bankruptcy Court, the Debtor is authorized to issue, execute, deliver or File with the Bankruptcy Court or record any agreements and other documents, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence implementation of the terms and conditions of the Plan.

**Section 18.10.    Time.**

Unless otherwise specified herein, in computing any period of time prescribed or allowed by the Plan, the day of the act or event from which the designated period begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, in which event the period runs until the end of next succeeding day that is a Business Day. Otherwise, the provisions of Bankruptcy Rule 9006 shall apply.

84

**Section 18.11.     Exhibits/Schedules.**

All exhibits and schedules to the Plan and any Plan Supplement are incorporated into and constitute a part of the Plan as if fully set forth therein.

**Section 18.12.     Defenses with Respect to Impaired or Unimpaired Claims.**

Except as otherwise specifically provided in the Plan, nothing shall affect the parties' rights and/or legal and equitable defenses with respect to any Impaired or Unimpaired Claim, including but not limited to all rights relating to legal and equitable defenses to setoffs or recoupments against any Unimpaired Claim.

**Section 18.13.     No Injunctive Relief.**

No Claim shall be entitled to specific performance or other injunctive, equitable or other prospective relief except as may be specified in the Plan.

**Section 18.14.     No Admissions.**

Notwithstanding anything herein to the contrary, prior to the Effective Date, nothing contained in the Plan or this Disclosure Statement shall be deemed an admission by any party with respect to any matter set forth therein or herein, including, without limitation, liability on any Claim or the propriety of any classification of any Claim; provided, however, that the provisions of the Plan shall be treated as admissions under the Federal Rules of Evidence upon the Effective Date.

**Section 18.15.     Extension of Time.**

Any period of time or deadline under the Plan may be extended by agreement of the parties affected thereby, or by order of the Bankruptcy Court upon good cause shown.

**Section 18.16.     Creditors' Committee.**

As of the Effective Date, the Creditors' Committee shall terminate and dissolve and the members thereof and the professionals retained by the Creditors' Committee in accordance with section 1103 of the Bankruptcy Code shall be released and discharged from their respective fiduciary obligations.  In addition, except as otherwise specified, the retention and employment of the attorneys, accountants and other agents of the Creditors Committee shall terminate on the Effective Date.

**Section 18.17.     Payment of Statutory Fees.**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code, and any applicable interest thereon, shall be paid by the Debtor on or before the Effective Date, and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor as and when such fees become due.  Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

2088236-1

**Section 18.18.      Conflict.**

To the extent that terms of Confirmation Order or the Plan are inconsistent with the Disclosure Statement or any agreement entered into between the Debtor and any other party pursuant to the Plan, the terms of the Plan control the Disclosure Statement and any such agreement.  To the extent of any inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall govern.

**Section 18.19.      Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of the Plan, any statement or provision contained therein, or the taking of any action by the Debtor with respect to the Plan shall be or shall be, deemed to be, an admission or waiver of any rights of the Debtor with respect to any Claims or Interests prior to the Effective Date.

# ARTICLE XIX

## ALTERNATIVES TO CONFIRMATION OF THE PLAN

If the Plan is not consummated, the Debtor's capital structure will remain over-leveraged and the Debtor will remain unable to service its debt obligations.  Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### 1.      Liquidation Under the Bankruptcy Code.

The Debtor could be liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article XIV and attached as Exhibit D to the Disclosure Statement.

### 2.      Alternative Plan(s) of Reorganization.

The Debtor believes that failure to confirm the Plan will lead inevitably to expensive and protracted Chapter 11 Case.  In formulating and developing the Plan, the Debtor has explored numerous other alternatives and engaged in an extensive negotiating process with the Consenting Lenders.

The Debtor believes that not only does the Plan fairly adjust the rights of various Classes of Claims, but also that the Plan provides superior recoveries to the Debtor's Creditors over any alternative capable of rational consideration (such as a chapter 7 liquidation), thus enabling many stakeholders to maximize their returns.  Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

86

THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. **THEREFORE, THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

### 3. Dismissal of the Debtor's Chapter 11 Case.

Dismissal of the Debtor's Chapter 11 Case would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Debtor's Chapter 11 Case, the Debtor would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the creditors of the Debtor, and possibly resulting in costly and protracted litigation in various jurisdictions.  The Debtor believes that these actions would seriously undermine its ability to obtain financing and could lead ultimately to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. Therefore, the Debtor believes that dismissal of the Debtor's Chapter 11 Case is not a viable alternative to the Plan.

## ARTICLE XX

## CONCLUSION

The Debtor believes that confirmation and implementation of the Plan is preferable because it will provide the greatest recovery to Holders of Claims.  Other alternatives could involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to creditors who hold Claims. The Debtor urges the Holders of Impaired Claims in Classes 3 and 4 who are entitled to vote on the Plan, to vote to accept the Plan and to evidence such acceptance by returning their Ballots to counsel for the Debtor so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on [VOTING DEADLINE].

2088236-1

Dated: Wilmington, Delaware
May 17, 2013

Respectfully submitted,

**NAMCO  LLC**

By:   /s/ Mark Scott
   Mark Scott
   Chief Executive Officer for Namco, LLC


Counsel:

**OLSHAN FROME WOLOSKY LLP**
Park Avenue Tower
65 East 55th Street
New York, New York 10022
Telephone:  (212) 451-2300
Facsimile:  (212) 451-2222

**A. M. SACCULLO LEGAL, LLC**
Anthony M. Saccullo (Bar No. 4141)
Thomas H. Kovach (Bar No. 3964)
27 Crimson King Drive
Bear, Delaware 19701
Telephone (302) 836-8877
Facsimile (302) 836-8787
ams@saccullolegal.com
kovach@saccullolegal.com

*Counsel for the Debtor and Debtor in Possession*